## LEMON ET AL. v. KURTZMAN, SUPERINTENDENT OF PUBLIC INSTRUCTION OF PENN- SYLVANIA, ET AL.

No. 89.   Argued March 3, 1971—Decided June 28, 1971*

*Together with No. 569, *Earley et al.* v. *DiCenso et al.*, and No. 570, *Robinson, Commissioner of Education of Rhode Island, et al.* v. *DiCenso et al.*, on appeal from the United States District Court for the District of Rhode Island.

604

BURGER, C. J., delivered the opinion of the Court, in which BLACK, DOUGLAS, HARLAN, STEWART, MARSHALL (as to Nos. 569 and 570), and BLACKMUN, JJ., joined. DOUGLAS, J., filed a concurring opinion, *post*, p. 625, in which BLACK, J., joined, and in which MARSHALL, J. (as to Nos. 569 and 570), joined, filing a separate statement, *post*, p. 642. BRENNAN, J., filed a concurring opinion, *post*, p. 642. WHITE, J., filed an opinion concurring in the judgment in No. 89 and dissenting in Nos. 569 and 570, *post*, p. 661. MARSHALL, J., took no part in the consideration or decision of No. 89.

*Henry W. Sawyer III* argued the cause and filed briefs for appellants in No. 89. *Edward Bennett Williams* argued the cause for appellants in No. 569. With him on the brief were *Jeremiah C. Collins* and *Richard P. McMahon*. *Charles F. Cottam* argued the cause for appellants in No. 570. With him on the brief were *Herbert F. DeSimone*, Attorney General of Rhode Island, and *W. Slater Allen, Jr.,* Assistant Attorney General.

*J. Shane Creamer* argued the cause for appellees Kurtzman et al. in No. 89. On the brief were *Fred Speaker*, Attorney General of Pennsylvania, *David W. Rutstein*, Deputy Attorney General, and *Edward Friedman*. *William B. Ball* argued the cause for appellee schools in No. 89. With him on the brief were *Joseph G. Skelly, James E. Gallagher, Jr., C. Clark Hodgson, Jr., Samuel Rappaport, Donald A. Semisch,* and *William D. Valente*. *Henry T. Reath* filed a brief for appellee Pennsylvania Association of Independent Schools in No. 89. *Leo*

*Pfeffer* and *Milton Stanzler* argued the cause for appellees in Nos. 569 and 570. With them on the brief were *Harold E. Adams, Jr.,* and *Allan M. Shine.*

Briefs of *amici curiae* urging reversal in No. 89 were filed by *Mr. Pfeffer* for the American Association of School Administrators et al.; by *Henry C. Clausen* for United Americans for Public Schools; by *Samuel Rabinove, Arnold Forster, George Soll, Joseph B. Robison, Paul Hartman,* and *Sol Rabkin* for the American Jewish Committee et al.; by *Franklin C. Salisbury* for Protestants and Other Americans United for Separation of Church and State; by *J. Harold Flannery* for the Center for Law and Education, Harvard University, et al.; and by *Peter L. Costas* and *Paul W. Orth* for the Connecticut State Conference of Branches of the NAACP et al.

Briefs of *amici curiae* urging affirmance in No. 89 were filed by *Acting Solicitor General Friedman, Assistant Attorney General Ruckelshaus, Robert V. Zener,* and *Donald L. Horowitz* for the United States; by *Paul W. Brown,* Attorney General of Ohio, *pro se,* and *Charles S. Lopeman,* First Assistant Attorney General, for the Attorney General of Ohio et al.; by *Levy Anderson* for the City of Philadelphia; by *Robert M. Landis* for the School District of Philadelphia; by the City of Pittsburgh; by *Bruce W. Kauffman, John M. Elliott,* and *Edward F. Mannino* for the City of Erie; by *James A. Kelly* for the School District of the City of Scranton; by *Charles M. Whelan, William R. Consedine, Alfred L. Scanlan, Arthur E. Sutherland,* and *Harmon Burns, Jr.,* for the National Catholic Educational Association et al.; by *Ethan A. Hitchcock* and *I. N. P. Stokes* for the National Association of Independent Schools, Inc.; by *Jerome H. Gerber* for the Pennsylvania State AFL–CIO; by *Thomas J. Ford, Edward J. Walsh, Jr.,* and *Theodore D. Hoffmann*

for the Long Island Conference of Religious Elementary and Secondary School Administrators; by *Nathan Lewin* for the National Jewish Commission on Law and Public Affairs; by *Stuart Hubbell* for Citizens for Educational Freedom; and by *Edward M. Koza, Walter L. Hill, Jr., Thomas R. Balaban,* and *William J. Pinkowski* for the Polish American Congress, Inc., et al.

The National Association of Laymen filed a brief as *amicus curiae* in No. 89.

Briefs of *amici curiae* urging reversal in Nos. 569 and 570 were filed by *Acting Solicitor General Friedman, Assistant Attorney General Gray,* and *Messrs. Zener* and *Horowitz* for the United States, and by *Jesse H. Choper* and *Messrs. Consedine, Whelan,* and *Burns* for the National Catholic Educational Association et al.

Briefs of *amici curiae* urging affirmance in Nos. 569 and 570 were filed by *Messrs. Rabinove, Robison, Forster,* and *Rabkin* for the American Jewish Committee et al.; by *Mr. Salisbury* for Protestants and Other Americans United for Separation of Church and State; by *Mr. Flannery* for the Center for Law and Education, Harvard University, et al.; and by *Messrs. Costas* and *Orth* for the Connecticut State Conference of Branches of the NAACP et al.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

These two appeals raise questions as to Pennsylvania and Rhode Island statutes providing state aid to church-related elementary and secondary schools. Both statutes are challenged as violative of the Establishment and Free Exercise Clauses of the First Amendment and the Due Process Clause of the Fourteenth Amendment.

Pennsylvania has adopted a statutory program that provides financial support to nonpublic elementary and

secondary schools by way of reimbursement for the cost of teachers' salaries, textbooks, and instructional materials in specified secular subjects. Rhode Island has adopted a statute under which the State pays directly to teachers in nonpublic elementary schools a supplement of 15% of their annual salary. Under each statute state aid has been given to church-related educational institutions. We hold that both statutes are unconstitutional.

## I

### The Rhode Island Statute

The Rhode Island Salary Supplement Act[1] was enacted in 1969. It rests on the legislative finding that the quality of education available in nonpublic elementary schools has been jeopardized by the rapidly rising salaries needed to attract competent and dedicated teachers. The Act authorizes state officials to supplement the salaries of teachers of secular subjects in nonpublic elementary schools by paying directly to a teacher an amount not in excess of 15% of his current annual salary. As supplemented, however, a nonpublic school teacher's salary cannot exceed the maximum paid to teachers in the State's public schools, and the recipient must be certified by the state board of education in substantially the same manner as public school teachers.

In order to be eligible for the Rhode Island salary supplement, the recipient must teach in a nonpublic school at which the average per-pupil expenditure on secular education is less than the average in the State's public schools during a specified period. Appellant State Commissioner of Education also requires eligible schools to submit financial data. If this information indicates a per-pupil expenditure in excess of the statutory limita-

---

[1] R. I. Gen. Laws Ann. § 16–51–1 et seq. (Supp. 1970).

tion, the records of the school in question must be examined in order to assess how much of the expenditure is attributable to secular education and how much to religious activity.[2]

The Act also requires that teachers eligible for salary supplements must teach only those subjects that are offered in the State's public schools. They must use "only teaching materials which are used in the public schools." Finally, any teacher applying for a salary supplement must first agree in writing "not to teach a course in religion for so long as or during such time as he or she receives any salary supplements" under the Act.

Appellees are citizens and taxpayers of Rhode Island. They brought this suit to have the Rhode Island Salary Supplement Act declared unconstitutional and its operation enjoined on the ground that it violates the Establishment and Free Exercise Clauses of the First Amendment. Appellants are state officials charged with administration of the Act, teachers eligible for salary supplements under the Act, and parents of children in church-related elementary schools whose teachers would receive state salary assistance.

A three-judge federal court was convened pursuant to 28 U. S. C. §§ 2281, 2284. It found that Rhode Island's nonpublic elementary schools accommodated approximately 25% of the State's pupils. About 95% of these pupils attended schools affiliated with the Roman Catholic church. To date some 250 teachers have applied for benefits under the Act. All of them are employed by Roman Catholic schools.

---

[2] The District Court found only one instance in which this breakdown between religious and secular expenses was necessary. The school in question was not affiliated with the Catholic church. The court found it unlikely that such determinations would be necessary with respect to Catholic schools because their heavy reliance on nuns kept their wage costs substantially below those of the public schools.

The court held a hearing at which extensive evidence was introduced concerning the nature of the secular instruction offered in the Roman Catholic schools whose teachers would be eligible for salary assistance under the Act. Although the court found that concern for religious values does not necessarily affect the content of secular subjects, it also found that the parochial school system was "an integral part of the religious mission of the Catholic Church."

The District Court concluded that the Act violated the Establishment Clause, holding that it fostered "excessive entanglement" between government and religion. In addition two judges thought that the Act had the impermissible effect of giving "significant aid to a religious enterprise." 316 F. Supp. 112. We affirm.

### The Pennsylvania Statute

Pennsylvania has adopted a program that has some but not all of the features of the Rhode Island program. The Pennsylvania Nonpublic Elementary and Secondary Education Act[3] was passed in 1968 in response to a crisis that the Pennsylvania Legislature found existed in the State's nonpublic schools due to rapidly rising costs. The statute affirmatively reflects the legislative conclusion that the State's educational goals could appropriately be fulfilled by government support of "those purely secular educational objectives achieved through nonpublic education . . . ."

The statute authorizes appellee state Superintendent of Public Instruction to "purchase" specified "secular educational services" from nonpublic schools. Under the "contracts" authorized by the statute, the State directly reimburses nonpublic schools solely for their actual expenditures for teachers' salaries, textbooks, and instructional materials. A school seeking reimbursement must·

---

[3] Pa. Stat. Ann., Tit. 24, §§ 5601–5609 (Supp. 1971).

maintain prescribed accounting procedures that identify the "separate" cost of the "secular educational service." These accounts are subject to state audit. The funds for this program were originally derived from a new tax on horse and harness racing, but the Act is now financed by a portion of the state tax on cigarettes.

There are several significant statutory restrictions on state aid. Reimbursement is limited to courses "presented in the curricula of the public schools." It is further limited "solely" to courses in the following "secular" subjects: mathematics, modern foreign languages,[4] physical science, and physical education. Textbooks and instructional materials included in the program must be approved by the state Superintendent of Public Instruction. Finally, the statute prohibits reimbursement for any course that contains "any subject matter expressing religious teaching, or the morals or forms of worship of any sect."

The Act went into effect on July 1, 1968, and the first reimbursement payments to schools were made on September 2, 1969. It appears that some $5 million has been expended annually under the Act. The State has now entered into contracts with some 1,181 nonpublic elementary and secondary schools with a student population of some 535,215 pupils—more than 20% of the total number of students in the State. More than 96% of these pupils attend church-related schools, and most of these schools are affiliated with the Roman Catholic church.

Appellants brought this action in the District Court to challenge the constitutionality of the Pennsylvania statute. The organizational plaintiffs-appellants are associations of persons resident in Pennsylvania declaring

---

[4] Latin, Hebrew, and classical Greek are excluded.

belief in the separation of church and state; individual plaintiffs-appellants are citizens and taxpayers of Pennsylvania. Appellant Lemon, in addition to being a citizen and a taxpayer, is a parent of a child attending public school in Pennsylvania. Lemon also alleges that he purchased a ticket at a race track and thus had paid the specific tax that supports the expenditures under the Act. Appellees are state officials who have the responsibility for administering the Act. In addition seven church-related schools are defendants-appellees.

A three-judge federal court was convened pursuant to 28 U. S. C. §§ 2281, 2284. The District Court held that the individual plaintiffs-appellants had standing to challenge the Act, 310 F. Supp. 42. The organizational plaintiffs-appellants were denied standing under *Flast* v. *Cohen*, 392 U. S. 83, 99, 101 (1968).

The court granted appellees' motion to dismiss the complaint for failure to state a claim for relief.[5] 310 F. Supp. 35. It held that the Act violated neither the Establishment nor the Free Exercise Clause, Chief Judge Hastie dissenting. We reverse.

## II

In *Everson* v. *Board of Education*, 330 U. S. 1 (1947), this Court upheld a state statute that reimbursed the parents of parochial school children for bus transportation

---

[5] Plaintiffs-appellants also claimed that the Act violated the Equal Protection Clause of the Fourteenth Amendment by providing state assistance to private institutions that discriminated on racial and religious grounds in their admissions and hiring policies. The court unanimously held that no plaintiff had standing to raise this claim because the complaint did not allege that the child of any plaintiff had been denied admission to any nonpublic school on racial or religious grounds. Our decision makes it unnecessary for us to reach this issue.

expenses. There MR. JUSTICE BLACK, writing for the majority, suggested that the decision carried to "the verge" of forbidden territory under the Religion Clauses. *Id.,* at 16. Candor compels acknowledgment, moreover, that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law.

The language of the Religion Clauses of the First Amendment is at best opaque, particularly when compared with other portions of the Amendment. Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be "no law *respecting* an establishment of religion." A law may be one "respecting" the forbidden objective while falling short of its total realization. A law "respecting" the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.

In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz* v. *Tax Commission,* 397 U. S. 664, 668 (1970).

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education* v. *Allen,* 392 U. S. 236, 243 (1968);

finally, the statute must not foster "an excessive government entanglement with religion." *Walz, supra,* at 674.

Inquiry into the legislative purposes of the Pennsylvania and Rhode Island statutes affords no basis for a conclusion that the legislative intent was to advance religion. On the contrary, the statutes themselves clearly state that they are intended to enhance the quality of the secular education in all schools covered by the compulsory attendance laws. There is no reason to believe the legislatures meant anything else. A State always has a legitimate concern for maintaining minimum standards in all schools it allows to operate. As in *Allen,* we find nothing here that undermines the stated legislative intent; it must therefore be accorded appropriate deference.

In *Allen* the Court acknowledged that secular and religious teachings were not necessarily so intertwined that secular textbooks furnished to students by the State were in fact instrumental in the teaching of religion. 392 U. S., at 248. The legislatures of Rhode Island and Pennsylvania have concluded that secular and religious education are identifiable and separable. In the abstract we have no quarrel with this conclusion.

The two legislatures, however, have also recognized that church-related elementary and secondary schools have a significant religious mission and that a substantial portion of their activities is religiously oriented. They have therefore sought to create statutory restrictions designed to guarantee the separation between secular and religious educational functions and to ensure that State financial aid supports only the former. All these provisions are precautions taken in candid recognition that these programs approached, even if they did not intrude upon, the forbidden areas under the Religion Clauses. We need not decide whether these legislative precautions restrict the principal or primary effect of the programs to the point where they do not offend the Religion

Clauses, for we conclude that the cumulative impact of the entire relationship arising under the statutes in each State involves excessive entanglement between government and religion.

### III

In *Walz* v. *Tax Commission, supra,* the Court upheld state tax exemptions for real property owned by religious organizations and used for religious worship. That holding, however, tended to confine rather than enlarge the area of permissible state involvement with religious institutions by calling for close scrutiny of the degree of entanglement involved in the relationship. The objective is to prevent, as far as possible, the intrusion of either into the precincts of the other.

Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. *Zorach* v. *Clauson,* 343 U. S. 306, 312 (1952); *Sherbert* v. *Verner,* 374 U. S. 398, 422 (1963) (HARLAN, J., dissenting). Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples of necessary and permissible contacts. Indeed, under the statutory exemption before us in *Walz,* the State had a continuing burden to ascertain that the exempt property was in fact being used for religious worship. Judicial caveats against entanglement must recognize that the line of separation, far from being a "wall," is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.

This is not to suggest, however, that we are to engage in a legalistic minuet in which precise rules and forms must govern. A true minuet is a matter of pure form and style, the observance of which is itself the substantive end. Here we examine the form of the relationship for the light that it casts on the substance.

In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority. MR. JUSTICE HARLAN, in a separate opinion in *Walz, supra,* echoed the classic warning as to "programs, whose very nature is apt to entangle the state in details of administration . . . ." *Id.,* at 695. Here we find that both statutes foster an impermissible degree of entanglement.

### (a) *Rhode Island program*

The District Court made extensive findings on the grave potential for excessive entanglement that inheres in the religious character and purpose of the Roman Catholic elementary schools of Rhode Island, to date the sole beneficiaries of the Rhode Island Salary Supplement Act.

The church schools involved in the program are located close to parish churches. This understandably permits convenient access for religous exercises since instruction in faith and morals is part of the total educational process. The school buildings contain identifying religious symbols such as crosses on the exterior and crucifixes, and religious paintings and statues either in the classrooms or hallways. Although only approximately 30 minutes a day are devoted to direct religious instruction, there are religiously oriented extracurricular activities. Approximately two-thirds of the teachers in these schools are nuns of various religious orders. Their dedicated efforts provide an atmosphere in which religious instruction and religious vocations are natural and proper parts of life in such schools. Indeed, as the District Court found, the role of teaching nuns in enhancing the religious atmosphere has led the parochial school au-

thorities to attempt to maintain a one-to-one ratio between nuns and lay teachers in all schools rather than to permit some to be staffed almost entirely by lay teachers.

On the basis of these findings the District Court concluded that the parochial schools constituted "an integral part of the religious mission of the Catholic Church." The various characteristics of the schools make them "a powerful vehicle for transmitting the Catholic faith to the next generation." This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly. In short, parochial schools involve substantial religious activity and purpose.[6]

The substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid. Although the District Court found that concern for religious values did not inevitably or necessarily intrude into the content of secular subjects, the considerable religious activities of these schools led the legislature to provide for careful governmental controls and surveillance by state authorities in order to ensure that state aid supports only secular education.

The dangers and corresponding entanglements are enhanced by the particular form of aid that the Rhode Island Act provides. Our decisions from *Everson* to *Allen* have permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials. Bus transportation, school lunches, public health services, and secular textbooks supplied in common to all students were not

---

[6] See, e. g., J. Fichter, Parochial School: A Sociological Study 77–108 (1958); Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, pt. II, The Nonestablishment Principle, 81 Harv. L. Rev. 513, 574 (1968).

thought to offend the Establishment Clause. We note that the dissenters in *Allen* seemed chiefly concerned with the pragmatic difficulties involved in ensuring the truly secular content of the textbooks provided at state expense.

In *Allen* the Court refused to make assumptions, on a meager record, about the religious content of the textbooks that the State would be asked to provide. We cannot, however, refuse here to recognize that teachers have a substantially different ideological character from books. In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not. We cannot ignore the danger that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of pre-college education. The conflict of functions inheres in the situation.

In our view the record shows these dangers are present to a substantial degree. The Rhode Island Roman Catholic elementary schools are under the general supervision of the Bishop of Providence and his appointed representative, the Diocesan Superintendent of Schools. In most cases, each individual parish, however, assumes the ultimate financial responsibility for the school, with the parish priest authorizing the allocation of parish funds. With only two exceptions, school principals are nuns appointed either by the Superintendent or the Mother Provincial of the order whose members staff the school. By 1969 lay teachers constituted more than a third of all teachers in the parochial elementary schools, and their number is growing. They are first interviewed by the superintendent's office and then by the school principal. The contracts are signed by the parish priest, and he retains some discretion in negotiating salary levels. Religious authority necessarily pervades the school system.

The schools are governed by the standards set forth in a "Handbook of School Regulations," which has the force of synodal law in the diocese. It emphasizes the role and importance of the teacher in parochial schools: "The prime factor for the success or the failure of the school is the spirit and personality, as well as the professional competency, of the teacher . . . ." The Handbook also states that: "Religious formation is not confined to formal courses; nor is it restricted to a single subject area." Finally, the Handbook advises teachers to stimulate interest in religious vocations and missionary work. Given the mission of the church school, these instructions are consistent and logical.

Several teachers testified, however, that they did not inject religion into their secular classes. And the District Court found that religious values did not necessarily affect the content of the secular instruction. But what has been recounted suggests the potential if not actual hazards of this form of state aid. The teacher is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith. These controls are not lessened by the fact that most of the lay teachers are of the Catholic faith. Inevitably some of a teacher's responsibilities hover on the border between secular and religious orientation.

We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faith are not inculcated or advanced by neutrals. With the best of intentions such a teacher would find it hard to make

a total separation between secular teaching and religious doctrine. What would appear to some to be essential to good citizenship might well for others border on or constitute instruction in religion. Further difficulties are inherent in the combination of religious discipline and the possibility of disagreement between teacher and religious authorities over the meaning of the statutory restrictions.

We do not assume, however, that parochial school teachers will be unsuccessful in their attempts to segregate their religious beliefs from their secular educational responsibilities. But the potential for impermissible fostering of religion is present. The Rhode Island Legislature has not, and could not, provide state aid on the basis of a mere assumption that secular teachers under religious discipline can avoid conflicts. The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion—indeed the State here has undertaken to do so. To ensure that no trespass occurs, the State has therefore carefully conditioned its aid with pervasive restrictions. An eligible recipient must teach only those courses that are offered in the public schools and use only those texts and materials that are found in the public schools. In addition the teacher must not engage in teaching any course in religion.

A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.

There is another area of entanglement in the Rhode Island program that gives concern. The statute excludes teachers employed by nonpublic schools whose average per-pupil expenditures on secular education equal or exceed the comparable figures for public schools. In the event that the total expenditures of an otherwise eligible school exceed this norm, the program requires the government to examine the school's records in order to determine how much of the total expenditures is attributable to secular education and how much to religious activity. This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction of church schools and hence of churches. The Court noted "the hazards of government supporting churches" in *Walz* v. *Tax Commission, supra,* at 675, and we cannot ignore here the danger that pervasive modern governmental power will ultimately intrude on religion and thus conflict with the Religion Clauses.

### (b) *Pennsylvania program*

The Pennsylvania statute also provides state aid to church-related schools for teachers' salaries. The complaint describes an educational system that is very similar to the one existing in Rhode Island. According to the allegations, the church-related elementary and secondary schools are controlled by religious organizations, have the purpose of propagating and promoting a particular religious faith, and conduct their operations to fulfill that purpose. Since this complaint was dismissed for failure to state a claim for relief, we must accept these allegations as true for purposes of our review.

As we noted earlier, the very restrictions and surveillance necessary to ensure that teachers play a strictly nonideological role give rise to entanglements between

church and state. The Pennsylvania statute, like that of Rhode Island, fosters this kind of relationship. Reimbursement is not only limited to courses offered in the public schools and materials approved by state officials, but the statute excludes "any subject matter expressing religious teaching, or the morals or forms of worship of any sect." In addition, schools seeking reimbursement must maintain accounting procedures that require the State to establish the cost of the secular as distinguished from the religious instruction.

The Pennsylvania statute, moreover, has the further defect of providing state financial aid directly to the church-related school. This factor distinguishes both *Everson* and *Allen,* for in both those cases the Court was careful to point out that state aid was provided to the student and his parents—not to the church-related school. *Board of Education* v. *Allen, supra,* at 243–244; *Everson* v. *Board of Education, supra,* at 18. In *Walz* v. *Tax Commission, supra,* at 675, the Court warned of the dangers of direct payments to religious organizations:

> "Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards . . . ."

The history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance. The government cash grants before us now provide no basis for predicting that comprehensive measures of surveillance and controls will not follow. In particular the government's post-audit power to inspect and evaluate a church-related school's financial records and to determine which expenditures are religious and

which are secular creates an intimate and continuing relationship between church and state.

## IV

A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.

Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. Freund, Comment, Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680, 1692 (1969). The potential divisiveness of such conflict is a threat to the normal political process. *Walz* v. *Tax Commission, supra,* at 695 (separate opinion of HARLAN, J.). See also *Board of Education* v. *Allen,* 392 U. S., at 249 (HARLAN, J., concurring); *Abington School District* v. *Schempp,* 374 U. S. 203, 307 (1963) (Goldberg, J., concurring). To have States or communities divide on the issues presented by state aid to parochial schools would tend to confuse

and obscure other issues of great urgency. We have an expanding array of vexing issues, local and national, domestic and international, to debate and divide on. It conflicts with our whole history and tradition to permit questions of the Religion Clauses to assume such importance in our legislatures and in our elections that they could divert attention from the myriad issues and problems that confront every level of government. The highways of church and state relationships are not likely to be one-way streets, and the Constitution's authors sought to protect religious worship from the pervasive power of government. The history of many countries attests to the hazards of religion's intruding into the political arena or of political power intruding into the legitimate and free exercise of religious belief.

Of course, as the Court noted in *Walz*, "[a]dherents of particular faiths and individual churches frequently take strong positions on public issues." *Walz* v. *Tax Commission, supra,* at 670. We could not expect otherwise, for religious values pervade the fabric of our national life. But in *Walz* we dealt with a status under state tax laws for the benefit of all religious groups. Here we are confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmentation and divisiveness on religious lines are thus likely to be intensified.

The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow. The Rhode Island District Court found that the parochial school system's "monumental and deepening financial crisis" would "inescapably" require larger annual appropriations subsidizing greater percentages of the salaries of lay teachers. Although no facts have been developed in this respect

in the Pennsylvania case, it appears that such pressures for expanding aid have already required the state legislature to include a portion of the state revenues from cigarette taxes in the program.

## V

In *Walz* it was argued that a tax exemption for places of religious worship would prove to be the first step in an inevitable progression leading to the establishment of state churches and state religion. That claim could not stand up against more than 200 years of virtually universal practice imbedded in our colonial experience and continuing into the present.

The progression argument, however, is more persuasive here. We have no long history of state aid to church-related educational institutions comparable to 200 years of tax exemption for churches. Indeed, the state programs before us today represent something of an innovation. We have already noted that modern governmental programs have self-perpetuating and self-expanding propensities. These internal pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support. Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach "the verge," have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a "downhill thrust" easily set in motion but difficult to retard or stop. Development by momentum is not invariably bad; indeed, it is the way the common law has grown, but it is a force to be recognized and reckoned with. The dangers are increased by the difficulty of perceiving in advance exactly where the "verge" of the precipice lies. As well as constituting an independent evil against which the Religion Clauses were intended to protect, involve-

ment or entanglement between government and religion serves as a warning signal.

Finally, nothing we have said can be construed to disparage the role of church-related elementary and secondary schools in our national life. Their contribution has been and is enormous. Nor do we ignore their economic plight in a period of rising costs and expanding need. Taxpayers generally have been spared vast sums by the maintenance of these educational institutions by religious organizations, largely by the gifts of faithful adherents.

The merit and benefits of these schools, however, are not the issue before us in these cases. The sole question is whether state aid to these schools can be squared with the dictates of the Religion Clauses. Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of government. The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn.

The judgment of the Rhode Island District Court in No. 569 and No. 570 is affirmed. The judgment of the Pennsylvania District Court in No. 89 is reversed, and the case is remanded for further proceedings consistent with this opinion.

MR. JUSTICE MARSHALL took no part in the consideration or decision of No. 89.

MR. JUSTICE DOUGLAS, whom MR. JUSTICE BLACK joins, concurring.

While I join the opinion of the Court, I have expressed at some length my views as to the rationale of today's decision in these three cases.

They involve two different statutory schemes for providing aid to parochial schools. *Lemon* deals with the Pennsylvania Nonpublic Elementary and Secondary Education Act, Laws 1968, Act No. 109. By its terms the Pennsylvania Act allows the State to provide funds directly to private schools to purchase "secular educational service" such as teachers' salaries, textbooks, and educational materials. Pa. Stat. Ann., Tit. 24, § 5604 (Supp. 1971). Reimbursement for these services may be made only for courses in mathematics, modern foreign languages, physical science, and physical education. Reimbursement is prohibited for any course containing subject matter "expressing religious teaching, or the morals or forms of worship of any sect." § 5603 (Supp. 1971). To qualify, a school must demonstrate that its pupils achieve a satisfactory level of performance in standardized tests approved by the Superintendent of Public Instruction, and that the textbooks and other instructional materials used in these courses have been approved by the Superintendent of Public Instruction. The three-judge District Court below upheld this statute against the argument that it violates the Establishment Clause. We noted probable jurisdiction. 397 U. S. 1034.

The *DiCenso* cases involve the Rhode Island Salary Supplement Act, Laws 1969, c. 246. The Rhode Island Act authorizes supplementing the salaries of teachers of secular subjects in nonprofit private schools. The supplement is not more than 15% of an eligible teacher's current salary but cannot exceed the maximum salary paid to teachers in the State's public schools. To be eligible a teacher must teach only those subjects offered in public schools in the State, must be certified in substantially the same manner as teachers in public schools, and may use only teaching materials which are used in the public schools. Also the teacher must agree in writing

"not to teach a course in religion for so long as or during such time as he or she receives any salary supplements." R. I. Gen. Laws Ann. § 16-51-3 (Supp. 1970). The schools themselves must not be operated for profit, must meet state educational standards, and the annual per-student expenditure for secular education must not equal or exceed "the average annual per student expenditure in the public schools in the state at the same grade level in the second preceding fiscal year." § 16-51-2 (Supp. 1970). While the Rhode Island Act, unlike the Pennsylvania Act, provides for direct payments to the teacher, the three-judge District Court below found it unconstitutional because it "results in excessive government entanglement with religion." Probable jurisdiction was noted and the cases were set for oral argument with the other school cases. 400 U. S. 901.

In *Walz* v. *Tax Commission*, 397 U. S. 664, 674, the Court in approving a tax exemption for church property said:

> "Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry, however. We must also be sure that the end result—the effect—is not an excessive government entanglement with religion."

There is in my view such an entanglement here. The surveillance or supervision of the States needed to police grants involved in these three cases, if performed, puts a public investigator into every classroom and entails a pervasive monitoring of these church agencies by the secular authorities. Yet if that surveillance or supervision does not occur the zeal of religious proselytizers promises to carry the day and make a shambles of the Establishment Clause. Moreover, when taxpayers of

many faiths are required to contribute money for the propagation of one faith, the Free Exercise Clause is infringed.

The analysis of the constitutional objections to these two state systems of grants to parochial or sectarian schools must start with the admitted and obvious fact that the *raison d'être* of parochial schools is the propagation of a religious faith. They also teach secular subjects; but they came into existence in this country because Protestant groups were perverting the public schools by using them to propagate their faith. The Catholics naturally rebelled. If schools were to be used to propagate a particular creed or religion, then Catholic ideals should also be served. Hence the advent of parochial schools.

By 1840 there were 200 Catholic parish schools in the United States.[1] By 1964 there were 60 times as many.[2] Today 57% of the 9,000 Catholic parishes in the country have their church schools. "[E]very diocesan chancery has its school department, and enjoys a primacy of status." [3] The parish schools indeed consume 40% to 65% of the parish's total income.[4] The parish is so "school centered" that "[t]he school almost becomes the very reason for being." [5]

Early in the 19th century the Protestants obtained control of the New York school system and used it to promote reading and teaching of the Scriptures as revealed in the King James version of the Bible.[6] The contests

---

[1] A. Stokes & L. Pfeffer, Church and State in the United States 229 (1964).

[2] *Ibid.*

[3] Deedy, Should Catholic Schools Survive?, New Republic, Mar. 13, 1971, pp. 15, 16.

[4] *Id.,* at 17.

[5] *Ibid.*

[6] Stokes & Pfeffer, *supra,* n. 1, at 231.

between Protestants and Catholics, often erupting into violence including the burning of Catholic churches, are a twice-told tale; [7] the Know-Nothing Party, which included in its platform "daily Bible reading in the schools," [8] carried three States in 1854—Massachusetts, Pennsylvania, and Delaware.[9] Parochial schools grew, but not Catholic schools alone. Other dissenting sects established their own schools—Lutherans, Methodists, Presbyterians, and others.[10] But the major force in shaping the pattern of education in this country was the conflict between Protestants and Catholics. The Catholics logically argued that a public school was sectarian when it taught the King James version of the Bible. They therefore wanted it removed from the public schools; and in time they tried to get public funds for their own parochial schools.[11]

The constitutional right of dissenters to substitute their parochial schools for public schools was sustained by the Court in *Pierce* v. *Society of Sisters,* 268 U. S. 510.

The story of conflict and dissension is long and well known. The result was a state of so-called equilibrium where religious instruction was eliminated from public schools and the use of public funds to support religious schools was deemed to be banned.[12]

But the hydraulic pressures created by political forces and by economic stress were great and they began to

---

[7] *Id.,* at 231–239.

[8] *Id.,* at 237.

[9] *Ibid.*

[10] R. Butts, The American Tradition in Religion and Education 115 (1950).

[11] *Id.,* at 118. And see R. Finney, A Brief History of the American Public School 44–45 (1924).

[12] See E. Knight, Education in the United States 3, 314 (3d rev. ed. 1951); E. Cubberley, Public Education in the United States 164 *et seq.* (1919).

change the situation.  Laws were passed—state and federal—that dispensed public funds to sustain religious schools and the plea was always in the educational frame of reference: education in all sectors was needed, from languages to calculus to nuclear physics.  And it was forcefully argued that a linguist or mathematician or physicist trained in religious schools was just as competent as one trained in secular schools.

And so we have gradually edged into a situation where vast amounts of public funds are supplied each year to sectarian schools.[13]

And the argument is made that the private parochial school system takes about $9 billion a year off the back of government [14]—as if that were enough to justify violating the Establishment Clause.

While the evolution of the public school system in this country marked an escape from denominational control and was therefore admirable as seen through the eyes of those who think like Madison and Jefferson, it has disadvantages.  The main one is that a state system may attempt to mold all students alike according to the views of the dominant group and to discourage the emergence of individual idiosyncrasies.

Sectarian education, however, does not remedy that condition.  The advantages of sectarian education relate solely to religious or doctrinal matters.  They give the

---

[13] In 1960 the Federal Government provided $500 million to private colleges and universities.  Amounts contributed by state and local governments to private schools at any level were negligible.  Just one decade later federal aid to private colleges and universities had grown to $2.1 billion.  State aid had begun and reached $100 million.  Statistical Abstract of the United States 105 (1970).  As the present cases demonstrate, we are now reaching a point where state aid is being given to private elementary and secondary schools as well as colleges and universities.

[14] Deedy, *supra*, n. 3, at 16.

church the opportunity to indoctrinate its creed delicately and indirectly, or massively through doctrinal courses.

Many nations follow that course: Moslem nations teach the Koran in their schools; Sweden vests its elementary education in the parish; Newfoundland puts its school system under three superintendents—one from the Church of England, one from the Catholic church, one from the United Church. In Ireland the public schools are under denominational managership—Catholic, Episcopalian, Presbyterian, and Hebrew.

England puts sectarian schools under the umbrella of its school system. It finances sectarian education; it exerts control by prescribing standards; it requires some free scholarships; it provides nondenominational membership on the board of directors.[15]

The British system is, in other words, one of surveillance over sectarian schools. We too have surveillance over sectarian schools but only to the extent of making sure that minimum educational standards are met, viz., competent teachers, accreditation of the school for diplomas, the number of hours of work and credits allowed, and so on.

But we have never faced, until recently, the problem of policing sectarian schools. Any surveillance to date has been minor and has related only to the consistently unchallenged matters of accreditation of the sectarian school in the State's school system.[16]

The Rhode Island Act allows a supplementary salary to a teacher in a sectarian school if he or she "does not teach a course in religion."

---

[15] S. Curtis, History of Education in Great Britain 316–383 (5th ed. 1963); W. Alexander, Education in England, c. II (2d ed. 1964).

[16] See *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534; *Meyer* v. *Nebraska*, 262 U. S. 390, 402.

The Pennsylvania Act provides for state financing of instruction in mathematics, modern foreign languages, physical science, and physical education, provided that the instruction in those courses "shall not include any subject matter expressing religious teaching, or the morals or forms of worship of any sect."

Public financial support of parochial schools puts those schools under disabilities with which they were not previously burdened. For, as we held in *Cooper* v. *Aaron*, 358 U. S. 1, 19, governmental activities relating to schools "must be exercised consistently with federal constitutional requirements." There we were concerned with equal protection; here we are faced with issues of Establishment of religion and its Free Exercise as those concepts are used in the First Amendment.

Where the governmental activity is the financing of the private school, the various limitations or restraints imposed by the Constitution on state governments come into play. Thus, Arkansas, as part of its attempt to avoid the consequences of *Brown* v. *Board of Education*, 347 U. S. 483, 349 U. S. 294, withdrew its financial support from some public schools and sent the funds instead to private schools. That state action was held to violate the Equal Protection Clause. *Aaron* v. *McKinley*, 173 F. Supp. 944, 952. We affirmed, *sub nom. Faubus* v. *Aaron*, 361 U. S. 197. Louisiana tried a like tactic and it too was invalidated. *Poindexter* v. *Louisiana Financial Assistance Commission*, 296 F. Supp. 686. Again we affirmed. 393 U. S. 17. Whatever might be the result in case of grants to students,[17] it is clear that once

---

[17] Grants to students in the context of the problems of desegregated public schools have without exception been stricken down as tools of the forbidden discrimination. See *Griffin* v. *School Bd. of Prince Edward County*, 377 U. S. 218; *Hall* v. *St. Helena Parish School Bd.*, 197 F. Supp. 649, aff'd, 368 U. S. 515; *Lee* v. *Macon County Bd.*, 267 F. Supp. 458, aff'd *sub nom. Wallace* v. *United*

one of the States finances a private school, it is duty-bound to make certain that the school stays within secular bounds and does not use the public funds to promote sectarian causes.

The government may, of course, finance a hospital though it is run by a religious order, provided it is open to people of all races and creeds. *Bradfield* v. *Roberts*, 175 U. S. 291. The government itself could enter the hospital business; and it would, of course, make no difference if its agents who ran its hospitals were Catholics, Methodists, agnostics, or whatnot. For the hospital is not indulging in religious instruction or guidance or indoctrination. As Mr. Justice Jackson said in *Everson* v. *Board of Education,* 330 U. S. 1, 26 (dissenting):

> "[Each State has] great latitude in deciding for itself, in the light of its own conditions, what shall be public purposes in its scheme of things. It may socialize utilities and economic enterprises and make taxpayers' business out of what conventionally had been private business. It may make public business of individual welfare, health, education, entertainment or security. But it cannot make public business of religious worship or instruction, or of attendance at religious institutions of any character."

The reason is that given by Madison in his Remonstrance: [18]

> "[T]he same authority which can force a citizen to contribute three pence only of his property for

---

*States,* 389 U. S. 215; *Poindexter* v. *Louisiana Financial Assistance Commission,* 275 F. Supp. 833, aff'd, 389 U. S. 571; *Brown* v. *South Carolina State Bd.,* 296 F. Supp. 199, aff'd, 393 U. S. 222; *Coffey* v. *State Educ. Finance Commission,* 296 F. Supp. 1389; *Lee* v. *Macon County Bd.,* 231 F. Supp. 743.

[18] Remonstrance ¶ 3. The Memorial and Remonstrance Against Religious Assessments has been reproduced in appendices to the

634

the support of any one establishment, may force him to conform to any other establishment . . . ."

When Madison in his Remonstrance attacked a taxing measure to support religious activities, he advanced a series of reasons for opposing it. One that is extremely relevant here was phrased as follows:[19] "[I]t will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects." Intermeddling, to use Madison's word, or "entanglement," to use what was said in *Walz,* has two aspects. The intrusion of government into religious schools through grants, supervision, or surveillance may result in establishment of religion in the constitutional sense when what the State does enthrones a particular sect for overt or subtle propagation of its faith. Those activities of the State may also intrude on the Free Exercise Clause by depriving a teacher, under threats of reprisals, of the right to give sectarian construction or interpretation of, say, history and literature, or to use the teaching of such subjects to inculcate a religious creed or dogma.

Under these laws there will be vast governmental suppression, surveillance, or meddling in church affairs. As I indicated in *Tilton* v. *Richardson, post,* p. 689, decided this day, school prayers, the daily routine of parochial schools, must go if our decision in *Engel* v. *Vitale,* 370 U. S. 421, is honored. If it is not honored, then the state has established a religious sect. Elimination of prayers is only part of the problem. The curriculum presents subtle and difficult problems. The constitutional mandate can in part be carried out by censoring the curricula. What is palpably a sectarian course can be marked for

opinion of Rutledge, J., in *Everson,* 330 U. S., at 63, and to that of Douglas, J., in *Walz,* 397 U. S., at 719.

[19] Remonstrance ¶ 11.

deletion. But the problem only starts there. Sectarian instruction, in which, of course, a State may not indulge, can take place in a course on Shakespeare or in one on mathematics. No matter what the curriculum offers, the question is, what is *taught?* We deal not with evil teachers but with zealous ones who may use any opportunity to indoctrinate a class.[20]

It is well known that everything taught in most parochial schools is taught with the ultimate goal of religious education in mind. Rev. Joseph H. Fichter, S. J., stated in Parochial School: A Sociological Study 86 (1958):

"It is a commonplace observation that in the parochial school religion permeates the whole curriculum, and is not confined to a single half-hour period of the day. Even arithmetic can be used as an instrument of pious thoughts, as in the case of the teacher who gave this problem to her class: 'If it takes forty thousand priests and a hundred and forty thousand sisters to care for forty million Catholics in the United States, how many more priests and sisters will be needed to convert and care for the hundred million non-Catholics in the United States?' "

One can imagine what a religious zealot, as contrasted to a civil libertarian, can do with the Ref-

---

[20] "In the parochial schools Roman Catholic indoctrination is included in every subject. History, literature, geography, civics, and science are given a Roman Catholic slant. The whole education of the child is filled with propaganda. That, of course, is the very purpose of such schools, the very reason for going to all of the work and expense of maintaining a dual school system. Their purpose is not so much to educate, but to indoctrinate and train, not to teach Scripture truths and Americanism, but to make loyal Roman Catholics. The children are regimented, and are told what to wear, what to do, and what to think." L. Boettner, Roman Catholicism 360 (1962).

ormation or with the Inquisition. Much history can be given the gloss of a particular religion. I would think that policing these grants to detect sectarian instruction would be insufferable to religious partisans and would breed division and dissension between church and state.

This problem looms large where the church controls the hiring and firing of teachers:

> "[I]n the public school the selection of a faculty and the administration of the school usually rests with a school board which is subject to election and recall by the voters, but in the parochial school the selection of a faculty and the administration of the school is in the hands of the bishop alone, and usually is administered through the local priest. If a faculty member in the public school believes that he has been treated unjustly in being disciplined or dismissed, he can seek redress through the civil court and he is guaranteed a hearing. But if a faculty member in a parochial school is disciplined or dismissed he has no recourse whatsoever. The word of the bishop or priest is final, even without explanation if he so chooses. The tax payers have a voice in the way their money is used in the public school, but the people who support a parochial school have no voice at all in such affairs." L. Boettner, Roman Catholicism 375 (1962).

*Board of Education* v. *Allen,* 392 U. S. 236, dealt only with textbooks. Even so, some had difficulty giving approval. Yet books can be easily examined independently of other aspects of the teaching process. In the present cases we deal with the totality of instruction destined to be sectarian, at least in part, if the religious character of the school is to be maintained. A school which operates to commingle religion with other instruction plainly cannot completely secularize its instruction.

Parochial schools, in large measure, do not accept the assumption that secular subjects should be unrelated to religious teaching.

*Lemon* involves a state statute that prescribes that courses in mathematics, modern foreign languages, physical science, and physical education "shall not include any subject matter expressing religious teaching, or the morals or forms of worship of any sect." The subtleties involved in applying this standard are obvious. It places the State astride a sectarian school and gives it power to dictate what is or is not secular, what is or is not religious. I can think of no more disrupting influence apt to promote rancor and ill-will between church and state than this kind of surveillance and control. They are the very opposite of the "moderation and harmony" between church and state which Madison thought was the aim and purpose of the Establishment Clause.

The *DiCenso* cases have all the vices which are in *Lemon,* because the supplementary salary payable to the teacher is conditioned on his or her not teaching "a course in religion."

Moreover, the *DiCenso* cases reveal another, but related, knotty problem presented when church and state launch one of these educational programs. The Bishop of Rhode Island has a Handbook of School Regulations for the Diocese of Providence.[21]

The school board supervises "the education, both spiritual and secular, in the parochial schools and diocesan high schools."

The superintendent is an agent of the bishop and he interprets and makes "effective state and diocesan educational directives."

---

[21] It was said on oral argument that the handbook shown as an exhibit in the record had been superseded. The provisions hereinafter quoted are from the handbook as it reads after all the deletions to which we were referred.

The pastors visit the schools and "give their assistance in promoting spiritual and intellectual discipline."

Community supervisors "assist the teacher in the problems of instruction" and these duties are:

"I. To become well enough acquainted with the teachers of their communities so as to be able to advise the community superiors on matters of placement and reassignment.

"II. To act as liaison between the provincialate and the religious teacher in the school.

"III. To cooperate with the superintendent by studving the diocesan school regulations and to encou ﹐ the teachers of their community to observe these regulations.

"IV. To avoid giving any orders or directions to the teachers of their community that may be in conflict with diocesan regulations or policy regarding curriculum, testing, textbooks, method, or administrative matters.

"V. To refer questions concerning school administration beyond the scope of their own authority to the proper diocesan school authorities, namely, the superintendent of schools or the pastor."

The length of the school day includes Mass:

"A full day session for Catholic schools at the elementary level consists of five and one-half hours, exclusive of lunch and Mass,[22] but inclusive of recess for pupils in grades 1–3."

A course of study or syllabus prescribed for an elementary or secondary school is "mandatory."

---

[22] "The use of school time to participate in the Holy Sacrifice of the Mass on the feasts of All Saints, Ascension, and the patronal saint of the parish or school, as well as during the 40 Hours Devotion, is proper and commendable."

Religious instruction is provided as follows:

"A. Systematic religious instructions must be provided in all schools of the diocese.

"B. Modern catechetics requires a teacher with unusual aptitudes, specialized training, and such unction of the spirit that his words possess the force of a personal call. He should be so filled with his subject that he can freely improvize in discussion, dramatization, drawing, song, and prayer. A teacher so gifted and so permeated by the message of the Gospel is rare. Perhaps no teacher in a given school attains that ideal. But some teachers come nearer it than others. If our pupils are to hear the Good News so that their minds are enlightened and their hearts respond to the love of God and His Christ, if they are to be formed into vital, twentieth-century Christians, they should receive their religious instructions only from the very best teachers.

"C. Inasmuch as the textbooks employed in religious instruction above the fifth grade require a high degree of catechetical preparation, religion should be a departmentalized subject in grade six through twelve."

Religious activities are provided, through observance of specified holy days and participation in Mass.

"Religious formation" is not restricted to courses but is achieved "through the example of the faculty, the tone of the school . . . and religious activities."

No unauthorized priest may address the students.

"Retreats and days of recollection form an integral part of our religious program in the Catholic schools."

Religious factors are used in the selection of students:

"Although wealth should never serve as a criterion for accepting a pupil into a Catholic school, all other

> things being equal, it would seem fair to give prefer-
> ence to a child whose parents support the parish.
> Regular use of the budget, rather than the size of
> the contributions, would appear equitable. It in-
> dicates whether parents regularly attend Mass."

These are only highlights of the handbook. But they indicate how pervasive is the religious control over the school and how remote this type of school is from the secular school. Public funds supporting that structure are used to perpetuate a doctrine and creed in innumerable and in pervasive ways. Those who man these schools are good people, zealous people, dedicated people. But they are dedicated to ideas that the Framers of our Constitution placed beyond the reach of government.

If the government closed its eyes to the manner in which these grants are actually used it would be allowing public funds to promote sectarian education. If it did not close its eyes but undertook the surveillance needed, it would, I fear, intermeddle in parochial affairs in a way that would breed only rancor and dissension.

We have announced over and over again that the use of taxpayers' money to support parochial schools violates the First Amendment, applicable to the States by virtue of the Fourteenth.

We said in unequivocal words in *Everson v. Board of Education,* 330 U. S. 1, 16, "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." We reiterated the same idea in *Zorach v. Clauson,* 343 U. S. 306, 314, and in *McGowan v. Maryland,* 366 U. S. 420, 443, and in *Torcaso v. Watkins,* 367 U. S. 488, 493. We repeated the same idea in *McCollum v. Board of Education,* 333 U. S. 203, 210, and added that a State's

tax-supported public schools could not be used "for the dissemination of religious doctrines" nor could a State provide the church "pupils for their religious classes through use of the State's compulsory public school machinery." *Id.*, at 212.

Yet in spite of this long and consistent history there are those who have the courage to announce that a State may nonetheless finance the *secular* part of a sectarian school's educational program. That, however, makes a grave constitutional decision turn merely on cost accounting and bookkeeping entries. A history class, a literature class, or a science class in a parochial school is not a separate institute; it is part of the organic whole which the State subsidizes. The funds are used in these cases to pay or help pay the salaries of teachers in parochial schools; and the presence of teachers is critical to the essential purpose of the parochial school, *viz.*, to advance the religious endeavors of the particular church. It matters not that the teacher receiving taxpayers' money only teaches religion a fraction of the time. Nor does it matter that he or she teaches no religion. The school is an organism living on one budget. What the taxpayers give for salaries of those who teach only the humanities or science without any trace of proselytizing enables the school to use all of its own funds for religious training. As Judge Coffin said, 316 F. Supp. 112, 120, we would be blind to realities if we let "sophisticated bookkeeping" sanction "almost total subsidy of a religious institution by assigning the bulk of the institution's expenses to 'secular' activities." And sophisticated attempts to avoid the Constitution are just as invalid as simple-minded ones. *Lane* v. *Wilson*, 307 U. S. 268, 275.

In my view the taxpayers' forced contribution to the

parochial schools in the present cases violates the First Amendment.

MR. JUSTICE MARSHALL, who took no part in the consideration or decision of No. 89, see *ante,* p. 625, while intimating no view as to the continuing vitality of *Everson* v. *Board of Education,* 330 U. S. 1 (1947), concurs in MR. JUSTICE DOUGLAS' opinion covering Nos. 569 and 570.

MR. JUSTICE BRENNAN.*

I agree that the judgments in Nos. 569 and 570 must be affirmed. In my view the judgment in No. 89 must be reversed outright. I dissent in No. 153 insofar as the plurality opinion and the opinion of my Brother WHITE sustain the constitutionality, as applied to sectarian institutions, of the Federal Higher Education Facilities Act of 1963, as amended, 77 Stat. 363, 20 U. S. C. § 711 *et seq.* (1964 ed. and Supp. V). In my view that Act is unconstitutional insofar as it authorizes grants of federal tax monies to sectarian institutions, but is unconstitutional only to that extent. I therefore think that our remand of the case should be limited to the direction of a hearing to determine whether the four institutional appellees here are sectarian institutions.

I continue to adhere to the view that to give concrete meaning to the Establishment Clause

"the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers. It is a line which the Court has consistently sought to mark in its decisions expounding the religious guarantees of the First

*This opinion also applies to No. 153, *Tilton et al.* v. *Richardson, Secretary of Health, Education, and Welfare, et al., post,* p. 672.

Amendment. What the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. When the secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government." *Abington School District* v. *Schempp,* 374 U. S. 203, 294–295 (1963) (concurring opinion); *Walz* v. *Tax Commission,* 397 U. S. 664, 680–681 (1970) (concurring opinion).

The common feature of all three statutes before us is the provision of a direct subsidy from public funds for activities carried on by sectarian educational institutions. We have sustained the reimbursement of parents for bus fares of students under a scheme applicable to both public and nonpublic schools, *Everson* v. *Board of Education,* 330 U. S. 1 (1947). We have also sustained the loan of textbooks in secular subjects to students of both public and nonpublic schools, *Board of Education* v. *Allen,* 392 U. S. 236 (1968). See also *Bradfield* v. *Roberts,* 175 U. S. 291 (1899).

The statutory schemes before us, however, have features not present in either the *Everson* or *Allen* schemes. For example, the reimbursement or the loan of books ended government involvement in *Everson* and *Allen.* In contrast each of the schemes here exacts a promise in some form that the subsidy will not be used to finance

courses in religious subjects—promises that must be and are policed to assure compliance. Again, although the federal subsidy, similar to the *Everson* and *Allen* subsidies, is available to both public and nonpublic colleges and universities, the Rhode Island and Pennsylvania subsidies are restricted to nonpublic schools, and for practical purposes to Roman Catholic parochial schools.[1] These and other features I shall mention mean for me that *Everson* and *Allen* do not control these cases. Rather, the history of public subsidy of sectarian schools, and the purposes and operation of these particular statutes must be examined to determine whether the statutes breach the Establishment Clause. *Walz* v. *Tax Commission, supra,* at 681 (concurring opinion).

---

[1] At the time of trial, 95% of the elementary school children in private schools in Rhode Island attended Roman Catholic schools. Only nonpublic school teachers could receive the subsidy and then only if they taught in schools in which the average per-pupil expenditure on secular education did not equal or exceed the average for the State's public schools. Some 250 of the 342 lay teachers employed in Rhode Island Roman Catholic schools had applied for and been declared eligible for the subsidy. To receive it the teacher must (1) have a state teaching certificate; (2) teach exclusively secular subjects taught in the State's public schools; (3) use only teaching materials approved for use in the public schools; (4) not teach religion; and (5) promise in writing not to teach a course in religion while receiving the salary supplement.

Unlike the Rhode Island case, the Pennsylvania case lacks a factual record since the complaint was dismissed on motion. We must therefore decide the constitutional challenge as addressed to the face of the Pennsylvania statute. Appellants allege that the nonpublic schools are segregated in Pennsylvania by race and religion and that the Act perpetrates and promotes the segregation of races "with the ultimate result of promoting two school systems in Pennsylvania—a public school system predominantly black, poor and inferior and a private, subsidized school system predominantly white, affluent and superior." Brief for Appellants Lemon et al. 9. The District Court held that appellants lacked standing to assert this equal protection claim. In my view this was plain error.

## I

In sharp contrast to the "undeviating acceptance given religious tax exemptions from our earliest days as a Nation," *ibid.*, subsidy of sectarian educational institutions became embroiled in bitter controversies very soon after the Nation was formed. Public education was, of course, virtually nonexistent when the Constitution was adopted. Colonial Massachusetts in 1647 had directed towns to establish schools, Benjamin Franklin in 1749 proposed a Philadelphia Academy, and Jefferson labored to establish a public school system in Virginia.[2] But these were the exceptions. Education in the Colonies was overwhelmingly a private enterprise, usually carried on as a denominational activity by the dominant Protestant sects. In point of fact, government generally looked to the church to provide education, and often contributed support through donations of land and money. E. Cubberley, Public Education in the United States 171 (1919).

Nor was there substantial change in the years immediately following ratification of the Constitution and the Bill of Rights. Schools continued to be local and, in the main, denominational institutions.[3] But the demand for public education soon emerged. The evolution of the struggle in New York City is illustrative.[4] In 1786, the first New York State Legislature ordered that one section in each township be set aside for the "gospel and schools." With no public schools, various private agencies and churches operated "charity schools" for the poor of New

[2] E. Cubberley, Public Education in the United States 17 (1919); *Abington School District* v. *Schempp*, 374 U. S. 203, 238 n. 7 and authorities cited therein (BRENNAN, J., concurring).

[3] C. Antieau, A. Downey, E. Roberts, Freedom from Federal Establishment 174 (1964).

[4] B. Confrey, Secularism in American Education: Its History 127–129 (1931).

York City and received money from the state common school fund. The forerunner of the city's public schools was organized in 1805 when DeWitt Clinton founded "The Society for Establishment of a Free School in the City of New York for the Education of such poor Children as do not belong to or are not provided for by any Religious Society." The State and city aided the society, and it built many schools. Gradually, however, competition and bickering among the Free School Society and the various church schools developed over the apportionment of state school funds. As a result, in 1825, the legislature transferred to the city council the responsibility for distributing New York City's share of the state funds. The council stopped funding religious societies which operated 16 sectarian schools but continued supporting schools connected with the Protestant Orphan Asylum Society. Thereafter, in 1831, the Catholic Orphan Asylum Society demanded and received public funds to operate its schools but a request of Methodists for funds for the same purpose was denied. Nine years later, the Catholics enlarged their request for public monies to include all parochial schools, contending that the council was subsidizing sectarian books and instruction of the Public School Society, which Clinton's Free School Society had become. The city's Scotch Presbyterian and Jewish communities immediately followed with requests for funds to finance their schools. Although the Public School Society undertook to revise its texts to meet the objections, in 1842, the state legislature closed the bitter controversy by enacting a law that established a City Board of Education to set up free public schools, prohibited the distribution of public funds to sectarian schools, and prohibited the teaching of sectarian doctrine in any public school.

The Nation's rapidly developing religious heterogeneity, the tide of Jacksonian democracy, and growing

urbanization soon led to widespread demands throughout the States for secular public education. At the same time strong opposition developed to use of the States' taxing powers to support private sectarian schools.[5] Although the controversy over religious exercises in the public schools continued into this century, *Schempp*, 374 U. S., at 268–277 (BRENNAN, J., concurring), the opponents of subsidy to sectarian schools had largely won their fight by 1900. In fact, after 1840, no efforts of sectarian schools to obtain a share of public school funds succeeded. Cubberley, *supra*, at 179. Between 1840 and 1875, 19 States added provisions to their constitutions prohibiting the use of public school funds to aid sectarian schools, *id.*, at 180, and by 1900, 16 more States had added similar provisions. In fact, no State admitted to the Union after 1858, except West Virginia, omitted such provision from its first constitution. *Ibid.* Today fewer than a half-dozen States omit such provisions from their constitutions.[6]

---

[5] See generally R. Butts, The American Tradition in Religion and Education 111–145 (1950); 2 A. Stokes, Church and State in the United States 47–72 (1950); Cubberley, *supra* n. 2, at 155–181.

[6] See Ala. Const., Art. XIV, § 263; Alaska Const., Art. VII, § 1; Ariz. Const., Art. II, § 12, Art. XI, §§ 7, 8; Ark. Const., Art. XIV, § 2; Calif. Const., Art. IX, § 8; Colo. Const., Art. IX, § 7; Conn. Const., Art. VIII, § 4; Del. Const., Art. X, § 3; Fla. Const., Decl. of Rights, Art. I, § 3; Ga. Const., Art. VIII, § 12, par. 1; Hawaii Const., Art. IX, § 1; Idaho Const., Art. IX, § 5; Ill. Const., Art. VIII, § 3; Ind. Const., Art. 8, § 3; Kan. Const., Art. 6, § 6 (c); Ky. Const., § 189; La. Const., Art. XII, § 13; Mass. Const., Amend. Art. XLVI, § 2; Mich. Const., Art. I, § 4; Minn. Const., Art. VIII, § 2; Miss. Const., Art. 8, § 208; Mo. Const., Art. IX, § 8; Mont. Const., Art. XI, § 8; Neb. Const., Art. VII, § 11; Nev. Const., Art. 11, § 10; N. H. Const., Pt. II, Art. 83; N. J. Const., Art. VIII, § 4, par. 2; N. Mex. Const., Art. XII, § 3; N. Y. Const., Art. XI, § 3; N. Car. Const., Art. IX, §§ 4, 12; N. Dak. Const., Art. VIII, § 152; Ohio Const., Art. VI, § 2; Okla. Const., Art. II, § 5; Ore. Const., Art. VIII, § 2; Penn. Const., Art. 3, § 15; R. I. Const., Art. XII, § 4; S. C. Const., Art. XI, § 9; S. Dak. Const., Art. VIII, § 16; Tenn.

And in 1897, Congress included in its appropriation act for the District of Columbia a statement declaring it

> "to be the policy of the Government of the United States to make no appropriation of money or property for the purpose of founding, maintaining, or aiding by payment for services, expenses, or otherwise, any church or religious denomination, or any institution or society which is under sectarian or ecclesiastical control." 29 Stat. 411.

Thus for more than a century, the consensus, enforced by legislatures and courts with substantial consistency, has been that public subsidy of sectarian schools constitutes an impermissible involvement of secular with

---

Const., Art. XI, § 12; Tex. Const., Art. VII, § 5; Utah Const., Art. X, § 13; Va. Const., Art. IX, § 141; Wash. Const., Art. IX, § 4; W. Va. Const., Art. XII, § 4; Wis. Const., Art. I, § 18, Art. X, § 2; Wyo. Const., Art. 7, § 8.

The overwhelming majority of these constitutional provisions either prohibit expenditures of public funds on sectarian schools, or prohibit the expenditure of public school funds for any purpose other than support of public schools. For a discussion and categorization of the various constitutional formulations, see Note, Catholic Schools and Public Money, 50 Yale L. J. 917 (1941). Many of the constitutional provisions are collected in B. Confrey, Secularism in American Education: Its History 47–125 (1931).

Many state constitutions explicitly apply the prohibition to aid to sectarian colleges and universities. See, e. g., Colo. Const., Art. IX, § 7; Idaho Const., Art. IX, § 5; Ill. Const., Art. VIII, § 3; Kan. Const., Art. 6, § 6 (c); Mass. Const., Amend. Art. XLVI, § 2; Mo. Const., Art. IX, § 8; Mont. Const., Art. XI, § 8; Neb. Const., Art. VII, § 11; N. Mex. Const., Art. XII, § 3; S. C. Const., Art. XI, § 9; Utah Const., Art. X, § 13; Wyo. Const., Art. 7, § 8. At least one judicial decision construing the word "schools" held that the word does not include colleges and universities, *Opinion of the Justices*, 214 Mass. 599, 102 N. E. 464 (1913), but that decision was overruled by constitutional amendment. Mass. Const., Amend. Art. XLVI, § 2.

religious institutions.[7] If this history is not itself compelling against the validity of the three subsidy statutes, in the sense we found in *Walz* that "undeviating acceptance" was highly significant in favor of the validity of religious tax exemption, other forms of governmental involvement that each of the three statutes requires tip the scales in my view against the validity of each of them. These are involvements that threaten "dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government." *Schempp,* 374 U. S., at 295 (BRENNAN, J., concurring). "[G]overnment and religion have discrete interests which are mutually best served when each avoids too close a proximity to the other. It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government." *Id.,* at 259 (BRENNAN, J., concurring). All three of these statutes require "too close a proximity" of government to the subsidized sectarian institutions and in my view create real dangers of "the secularization of a creed."

---

[7] See, *e. g., Wright* v. *School Dist.,* 151 Kan. 485, 99 P. 2d 737 (1940); *Atchison, T. & S. F. R. Co.* v. *City of Atchison,* 47 Kan. 712, 28 P. 1000 (1892); *Williams* v. *Board of Trustees,* 173 Ky. 708, 191 S. W. 507 (1917); *Opinion of the Justices,* 214 Mass. 599, 102 N. E. 464 (1913); *Jenkins* v. *Andover,* 103 Mass. 94 (1869); *Otken* v. *Lamkin,* 56 Miss. 758 (1879); *Harfst* v. *Hoegen,* 349 Mo. 808, 163 S. W. 2d 609 (1942); *State ex rel. Public School Dist.* v. *Taylor,* 122 Neb. 454, 240 N. W. 573 (1932); *State ex rel. Nevada Orphan Asylum* v. *Hallock,* 16 Nev. 373 (1882); *Synod of Dakota* v. *State,* 2 S. D. 366, 50 N. W. 632 (1891).

## II

The Rhode Island statute requires Roman Catholic teachers to surrender their right to teach religion courses and to promise not to "inject" religious teaching into their secular courses. This has led at least one teacher to stop praying with his classes,[8] a concrete testimonial to the self-censorship that inevitably accompanies state regulation of delicate First Amendment freedoms. Cf. *Smith* v. *California*, 361 U. S. 147 (1959); *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958). Both the Rhode Island and Pennsylvania statutes prescribe extensive standardization of the content of secular courses, and of the teaching materials and textbooks to be used in teaching the courses. And the regulations to implement those requirements necessarily require policing of instruction in the schools. The picture of state inspectors prowling the halls of parochial schools and auditing classroom instruction surely raises more than an imagined specter of governmental "secularization of a creed."

The same dangers attend the federal subsidy even if less obviously. The Federal Government exacts a promise that no "sectarian instruction" or "religious worship" will take place in a subsidized building. The Office of Education polices the promise.[9] In one instance federal

[8] "Already the Act has restricted the role of teachers. The evidence before us indicates that some otherwise qualified teachers have stopped teaching courses in religion in order to qualify for aid under the Act. One teacher, in fact, testified that he no longer prays with his class lest he endanger his subsidy." 316 F. Supp., at 121.

[9] The Office of Education stipulated as follows:

"The Office of Education is now engaged in making a series of on-site reviews of completed projects to verify that conditions under which Federal assistance was provided are being implemented. During these visits, class schedules and course descriptions contained in the school catalog are analyzed to ascertain that nothing in the nature of sectarian instruction is scheduled in any area constructed with the

officials demanded that a college cease teaching a course entitled "The History of Methodism" in a federally assisted building, although the Establishment Clause "plainly does not foreclose teaching *about* the Holy Scriptures or about the differences between religious sects in classes in literature or history." *Schempp,* 374 U. S., at 300 (BRENNAN, J., concurring). These examples illustrate the complete incompatibility of such surveillance with the restraints barring interference with religious freedom.[10]

Policing the content of courses, the specific textbooks used, and indeed the words of teachers is far different from the legitimate policing carried on under state compulsory attendance laws or laws regulating minimum levels of educational achievement. Government's legitimate interest in ensuring certain minimum skill levels and the acquisition of certain knowledge does not carry with it power to prescribe what shall *not* be taught, or what methods of instruction shall be used, or what opinions the teacher may offer in the course of teaching.

Moreover, when a sectarian institution accepts state financial aid it becomes obligated under the Equal Protection Clause of the Fourteenth Amendment not to discriminate in admissions policies and faculty selection.

---

use of Federal funds. If there is found to be an indication that a portion of academic facilities constructed with Federal assistance is used in any way for sectarian purposes, *either the questionable practice must be terminated* or the institution must assume full responsibility for the cost of constructing the area involved." App. in No. 153, p. 82 (emphasis added).

[10] The plurality opinion in No. 153 would strike down the 20-year "period of Federal interest," 20 U. S. C. § 754 (a), upon the ground that "[t]he restrictive obligations of a recipient institution under § 751 (a) (2) cannot, compatibly with the Religion Clauses, expire while the building has substantial value." *Post,* at 683. Thus the surveillance constituting the "too close a proximity" which for me offends the Establishment Clause continues for the life of the building.

The District Court in the Rhode Island case pinpointed the dilemma:

> "Applying these standards to parochial schools might well restrict their ability to discriminate in admissions policies and in the hiring and firing of 'eachers. At some point the school becomes 'public' for more purposes than the Church could wish. At that point, the Church may justifiably feel that its victory on the Establishment Clause has meant abandonment of the Free Exercise Clause." 316 F. Supp., at 121–122 (citations omitted).

### III

In any event, I do not believe that elimination of these aspects of "too close a proximity" would save these three statutes. I expressed the view in *Walz* that "[g]eneral subsidies of religious activities would, of course, constitute impermissible state involvement with religion." 397 U. S., at 690 (concurring opinion). I do not think the subsidies under these statutes fall outside "[g]eneral subsidies of religious activities" merely because they are restricted to support of the teaching of secular subjects. In *Walz*, the passive aspect of the benefits conferred by a tax exemption, particularly since cessation of the exemptions might easily lead to impermissible involvements and conflicts, led me to conclude that exemptions were consistent with the First Amendment values. However, I contrasted direct government subsidies:

> "Tax exemptions and general subsidies, however, are qualitatively different. Though both provide economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such

transfer. It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes. In other words, '[i]n the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches,' while '[i]n the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions.' Thus, 'the symbolism of tax exemption is significant as a manifestation that organized religion is not expected to support the state; by the same token the state is not expected to support the church.'" 397 U. S., at 690–691 (footnotes and citations omitted) (concurring opinion).

Pennsylvania, Rhode Island, and the Federal Government argue strenuously that the government monies in all these cases are not "[g]eneral subsidies of religious activities" because they are paid specifically and solely for the secular education that the sectarian institutions provide.[11]

Before turning to the decisions of this Court on which this argument is based, it is important to recall again the history of subsidies to sectarian schools. See Part

---

[11] The Pennsylvania statute differs from Rhode Island's in providing the subsidy without regard to whether the sectarian school's average per-pupil expenditure on secular education equals or exceeds the average of the State's public schools. Nor is there any limitation of the subsidy to nonpublic schools that are financially embarrassed. Thus the statute on its face permits use of the state subsidy for the purpose of maintaining or attracting an audience for religious education, and also permits sectarian schools not needing the aid to apply it to exceed the quality of secular education provided in public schools. These features of the Pennsylvania scheme seem to me to invalidate it under the Establishment Clause as granting preferences to sectarian schools.

I, *supra.* The universality of state constitutional provisions forbidding such grants, as well as the weight of judicial authority disapproving such aid as a violation of our tradition of separation of church and state, reflects a time-tested judgment that such grants do indeed constitute impermissible aid to religion. See nn. 6 and 7, *supra.* The recurrent argument, consistently rejected in the past, has been that government grants to sectarian schools ought not be viewed as impermissible subsidies "because [the schools] relieve the State of a burden, which it would otherwise be itself required to bear . . . . they will render a service to the state by performing for it its duty of educating the children of the people." *Cook County* v. *Chicago Industrial School,* 125 Ill. 540, 571, 18 N. E. 183, 197 (1888).

Nonetheless, it is argued once again in these cases that sectarian schools and universities perform two separable functions. First, they provide secular education, and second, they teach the tenets of a particular sect. Since the State has determined that the secular education provided in sectarian schools serves the legitimate state interest in the education of its citizens, it is contended that state aid solely to the secular education function does not involve the State in aid to religion. *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), and *Board of Education* v. *Allen, supra,* are relied on as support for the argument.

Our opinion in *Allen* recognized that sectarian schools provide both a secular and a sectarian education:

"[T]his Court has long recognized that religious schools pursue two goals, religious instruction and secular education. In the leading case of *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), the Court held that . . . Oregon had not shown that its interest in secular education required that all children attend publicly operated schools. A premise of this

holding was the view that the State's interest in education would be served sufficiently by reliance on the secular teaching that accompanied religious training in the schools maintained by the Society of Sisters.

. . . . .

"[T]he continued willingness to rely on private school systems, including parochial systems, strongly suggests that a wide segment of informed opinion, legislative and otherwise, has found that those schools do an acceptable job of providing secular education to their students. This judgment is further evidence that parochial schools are performing, in addition to their sectarian function, the task of secular education." *Board of Education* v. *Allen*, 392 U. S., at 245, 247–248 (footnote omitted).

But I do not read *Pierce* or *Allen* as supporting the proposition that public subsidy of a sectarian institution's secular training is permissible state involvement. I read them as supporting the proposition that as an identifiable set of skills and an identifiable quantum of knowledge, secular education may be effectively provided either in the religious context of parochial schools, or outside the context of religion in public schools. The State's interest in secular education may be defined broadly as an interest in ensuring that all children within its boundaries acquire a minimum level of competency in certain skills, such as reading, writing, and arithmetic, as well as a minimum amount of information and knowledge in certain subjects such as history, geography, science, literature, and law. Without such skills and knowledge, an individual will be at a severe disadvantage both in participating in democratic self-government and in earning a living in a modern industrial economy. But the State has no proper interest in prescribing the precise forum in which such skills and knowledge are learned since acquisition of this

secular education is neither incompatible with religious learning, nor is it inconsistent with or inimical to religious precepts.

When the same secular educational process occurs in both public and sectarian schools, *Allen* held that the State could provide secular textbooks for use in that process to students in both public and sectarian schools. Of course, the State could not provide textbooks giving religious instruction. But since the textbooks involved in *Allen* would, at least in theory, be limited to secular education, no aid to sectarian instruction was involved.

More important, since the textbooks in *Allen* had been previously provided by the parents, and not the schools, 392 U. S., at 244 n. 6, no aid to the institution was involved. Rather, as in the case of the bus transportation in *Everson,* the general program of providing all children in the State with free secular textbooks assisted all parents in schooling their children. And as in *Everson,* there was undoubtedly the possibility that some parents might not have been able to exercise their constitutional right to send their children to parochial school if the parents were compelled themselves to pay for textbooks. However, as my Brother BLACK wrote for the Court in *Everson,*

> "[C]utting off church schools from these [general] services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them." 330 U. S., at 18.

*Allen,* in my view, simply sustained a statute in which the State was "neutral in its relations with groups of religious believers and non-believers." The only context in which the Court in *Allen* employed the distinction between secular and religious in a parochial school was to reach its conclusion that the textbooks that the State was providing could and would be secular.[12] The present cases, however, involve direct subsidies of tax monies to the schools themselves and we cannot blink the fact that the secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.

The District Court in the *DiCenso* case found that all the varied aspects of the parochial school's program—the nature of its faculty, its supervision, decor, program, extracurricular activities, assemblies, courses, etc.—produced an "intangible 'religious atmosphere,' " since the "diocesan school system is an integral part of the religious mission of the Catholic Church" and "a powerful vehicle for transmitting the Catholic faith to the next generation." 316 F. Supp., at 117. Quality teaching in secular subjects is an integral part of this religious enterprise. "Good secular teaching is as essential to the religious mission of the parochial schools as a roof for the school or desks for the classrooms." 316 F. Supp., at 117–118. That teaching cannot be separated from the environment in which it occurs, for its integration with the religious mission is both the theory and the strength of the religious school.

The common ingredient of the three prongs of the test

---

[12] The three dissenters in *Allen* focused primarily on their disagreement with the Court that the textbooks provided would be secular. See 392 U. S., at 252–253 (BLACK, J., dissenting); *id.,* at 257 (DOUGLAS, J., dissenting); *id.,* at 270 (Fortas, J., dissenting).

set forth at the outset of this opinion is whether the statutes involve government in the "essentially religious activities" of religious institutions. My analysis of the operation, purposes, and effects of these statutes leads me inescapably to the conclusion that they do impermissibly involve the States and the Federal Government with the "essentially religious activities" of sectarian educational institutions. More specifically, for the reasons stated, I think each government uses "essentially religious means to serve governmental ends, where secular means would suffice." This Nation long ago committed itself to primary reliance upon publicly supported public education to serve its important goals in secular education. Our religious diversity gave strong impetus to that commitment.

> "[T]he American experiment in free public education available to all children has been guided in large measure by the dramatic evolution of the religious diversity among the population which our public schools serve. . . . The public schools are supported entirely, in most communities, by public funds—funds exacted not only from parents, nor alone from those who hold particular religious views, nor indeed from those who subscribe to any creed at all. It is implicit in the history and character of American public education that the public schools serve a uniquely *public* function: the training of American citizens in an atmosphere free of parochial, divisive, or separatist influences of any sort—an atmosphere in which children may assimilate a heritage common to all American groups and religions. This is a heritage neither theistic nor atheistic, but simply civic and patriotic." *Schempp,* 374 U. S., at 241–242 (citation omitted) (BRENNAN, J., concurring).

I conclude that, in using sectarian institutions to further goals in secular education, the three statutes do violence to the principle that "government may not employ religious means to serve secular interests, however legitimate they may be, at least without the clearest demonstration that nonreligious means will not suffice." *Schempp, supra,* at 265 (BRENNAN, J., concurring).

## IV

The plurality's treatment of the issues in *Tilton,* No. 153, diverges so substantially from my own that I add these further comments. I believe that the Establishment Clause forbids the Federal Government to provide funds to sectarian universities in which the propagation and advancement of a particular religion are a function or purpose of the institution. Since the District Court made no findings whether the four institutional appellees here are sectarian, I would remand the case to the District Court with directions to determine whether the institutional appellees are "sectarian" institutions.

I reach this conclusion for the reasons I have stated: the necessarily deep involvement of government in the religious activities of such an institution through the policing of restrictions, and the fact that subsidies of tax monies directly to a sectarian institution necessarily aid the proselytizing function of the institution. The plurality argues that neither of these dangers is present.[13]

At the risk of repetition, I emphasize that a sectarian university is the equivalent in the realm of higher education of the Catholic elementary schools in Rhode Island; it is an educational institution in which the propagation

---

[13] Much of the plurality's argument is directed at establishing that the specific institutional appellees here, as well as most church-related colleges, are not sectarian in that they do not have a purpose or function to advance or propagate a specific religion. Those questions must await hearings and findings by the District Court.

and advancement of a particular religion are a primary function of the institution. I do not believe that construction grants to such a sectarian institution are permissible. The reason is not that religion "permeates" the secular education that is provided. Rather, it is that the secular education is provided within the environment of religion; the institution is dedicated to two goals, secular education *and* religious instruction. When aid flows directly to the institution, both functions benefit. The plurality would examine only the activities that occur within the federally assisted building and ignore the religious nature of the school of which it is a part. The "religious enterprise" aided by the construction grants involves the maintenance of an educational environment—which includes high-quality, purely secular educational courses—within which religious instruction occurs in a variety of ways.

The plurality also argues that no impermissible entanglement exists here. My Brother WHITE cogently comments upon that argument: "Why the federal program in the *Tilton* case is not embroiled in the same difficulties [as the Rhode Island program] is never adequately explained." *Post,* at 668. I do not see any significant difference in the Federal Government's telling the sectarian university not to teach any nonsecular subjects in a certain building, and Rhode Island's telling the Catholic school teacher not to teach religion. The vice is the creation through subsidy of a relationship in which the government polices the teaching practices of a religious school or university. The plurality suggests that the facts that college students are less impressionable and that college courses are less susceptible to religious permeation may lessen the need for federal policing. But the record shows that such policing has occurred and occurred in a heavy-handed way. Given the dangers of self-censorship in such a situation, I cannot agree that the dangers of

entanglement are insubstantial. Finally, the plurality suggests that the "nonideological" nature of a building, as contrasted with a teacher, reduces the need for policing. But the Federal Government imposes restrictions on every class taught in the federally assisted building. It is therefore not the "nonideological" building that is policed; rather, it is the courses given there and the teachers who teach them. Thus, the policing is precisely the same as under the state statutes, and that is what offends the Constitution.

## V

I, therefore, agree that the two state statutes that focus primarily on providing public funds to sectarian schools are unconstitutional. However, the federal statute in No. 153 is a general program of construction grants to all colleges and universities, including sectarian institutions. Since I believe the statute's extension of eligibility to sectarian institutions is severable from the broad general program authorized, I would hold the Higher Education Facilities Act unconstitutional only insofar as it authorized grants of federal tax monies to sectarian institutions—institutions that have a purpose or function to propagate or advance a particular religion. Therefore, if the District Court determines that any of the four institutional appellees here are "sectarian," that court, in my view, should enjoin the other appellees from making grants to it.

MR. JUSTICE WHITE, concurring in the judgments in No. 153 (*post,* p. 672) and No. 89 and dissenting in Nos. 569 and 570.

It is our good fortune that the States of this country long ago recognized that instruction of the young and old ranks high on the scale of proper governmental func-

tions and not only undertook secular education as a public responsibility but also required compulsory attendance at school by their young. Having recognized the value of educated citizens and assumed the task of educating them, the States now before us assert a right to provide for the secular education of children whether they attend public schools or choose to enter private institutions, even when those institutions are church-related. The Federal Government also asserts that it is entitled, where requested, to contribute to the cost of secular education by furnishing buildings and facilities to all institutions of higher learning, public and private alike. Both the United States and the States urge that if parents choose to have their children receive instruction in the required secular subjects in a school where religion is also taught and a religious atmosphere may prevail, part or all of the cost of such secular instruction may be paid for by governmental grants to the religious institution conducting the school and seeking the grant. Those who challenge this position would bar official contributions to secular education where the family prefers the parochial to both the public and nonsectarian private school.

The issue is fairly joined. It is precisely the kind of issue the Constitution contemplates this Court must ultimately decide. This is true although neither affirmance nor reversal of any of these cases follows automatically from the spare language of the First Amendment, from its history, or from the cases of this Court construing it and even though reasonable men can very easily and sensibly differ over the import of that language.

But, while the decision of the Court is legitimate, it is surely quite wrong in overturning the Pennsylvania and Rhode Island statutes on the ground that they amount to an establishment of religion forbidden by the First Amendment.

No one in these cases questions the constitutional right of parents to satisfy their state-imposed obligation to educate their children by sending them to private schools, sectarian or otherwise, as long as those schools meet minimum standards established for secular instruction. The States are not only permitted, but required by the Constitution, to free students attending private schools from any public school attendance obligation. *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). The States may also furnish transportation for students, *Everson* v. *Board of Education,* 330 U. S. 1 (1947), and books for teaching secular subjects to students attending parochial and other private as well as public schools, *Board of Education* v. *Allen,* 392 U. S. 236 (1968); we have also upheld arrangements whereby students are released from public school classes so that they may attend religious instruction. *Zorach* v. *Clauson,* 343 U. S. 306 (1952). Outside the field of education, we have upheld Sunday closing laws, *McGowan* v. *Maryland,* 366 U. S. 420 (1961), state and federal laws exempting church property and church activity from taxation, *Walz* v. *Tax Commission,* 397 U. S. 664 (1970), and governmental grants to religious organizations for the purpose of financing improvements in the facilities of hospitals managed and controlled by religious orders. *Bradfield* v. *Roberts,* 175 U. S. 291 (1899).

Our prior cases have recognized the dual role of parochial schools in American society: they perform both religious and secular functions. See *Board of Education* v. *Allen, supra,* at 248. Our cases also recognize that legislation having a secular purpose and extending governmental assistance to sectarian schools in the performance of their secular functions does not constitute "law[s] respecting an establishment of religion" forbidden by the First Amendment merely because a secular program may incidentally benefit a church in fulfilling its religious mis-

sion. That religion may indirectly benefit from governmental aid to the secular activities of churches does not convert that aid into an impermissible establishment of religion.

This much the Court squarely holds in the *Tilton* case, where it also expressly rejects the notion that payments made directly to a religious institution are, without more, forbidden by the First Amendment. In *Tilton,* the Court decides that the Federal Government may finance the separate function of secular education carried on in a parochial setting. It reaches this result although sectarian institutions undeniably will obtain substantial benefit from federal aid; without federal funding to provide adequate facilities for secular education, the student bodies of those institutions might remain stationary or even decrease in size and the institutions might ultimately have to close their doors.

It is enough for me that the States and the Federal Government are financing a separable secular function of overriding importance in order to sustain the legislation here challenged. That religion and private interests other than education may substantially benefit does not convert these laws into impermissible establishments of religion.

It is unnecessary, therefore, to urge that the Free Exercise Clause of the First Amendment at least permits government in some respects to modify and mold its secular programs out of express concern for free-exercise values. See *Walz* v. *Tax Commission, supra,* at 673 (tax exemption for religious properties; "[t]he limits of permissible state accommodation to religion are by no means coextensive with the noninterference mandated by the Free Exercise Clause. To equate the two would be to deny a national heritage with roots in the Revolution itself"); *Sherbert* v. *Verner,* 374 U. S. 398 (1963) (exemption of Seventh Day Adventist from eligibility requirements for

unemployment insurance. not only permitted but required by the Free Exercise Clause); *Zorach* v. *Clauson, supra,* at 313–314 (students excused from regular public school routine to obtain religious instruction; "[w]hen the state encourages religious instruction . . . it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs"). See also *Abington School District* v. *Schempp,* 374 U. S. 203, 308 (1963) (STEWART, J., dissenting); *Welsh* v. *United States,* 398 U. S. 333, 367 (1970) (WHITE, J., dissenting). The Establishment Clause, however, coexists in the First Amendment with the Free Exercise Clause and the latter is surely relevant in cases such as these. Where a state program seeks to ensure the proper education of its young, in private as well as public schools, free exercise considerations at least counsel against refusing support for students attending parochial schools simply because in that setting they are also being instructed in the tenets of the faith they are constitutionally free to practice.

I would sustain both the federal and the Rhode Island programs at issue in these cases, and I therefore concur in the judgment in No. 153 [1] and dissent from the judgments in Nos. 569 and 570. Although I would also reject the facial challenge to the Pennsylvania statute, I concur in the judgment in No. 89 for the reasons given below.

The Court strikes down the Rhode Island statute on its face. No fault is found with the secular purpose of the program; there is no suggestion that the purpose of the program was aid to religion disguised in secular attire. Nor does the Court find that the primary effect of the program is to aid religion rather than to implement secular goals. The Court nevertheless finds-

---

[1] I accept the Court's invalidation of the provision in the federal legislation whereby the restriction on the use of buildings constructed with federal funds terminates after 20 years.

that impermissible "entanglement" will result from administration of the program. The reasoning is a curious and mystifying blend, but a critical factor appears to be an unwillingness to accept the District Court's express findings that on the evidence before it none of the teachers here involved mixed religious and secular instruction. Rather, the District Court struck down the Rhode Island statute because it concluded that activities outside the secular classroom would probably have a religious content and that support for religious education therefore necessarily resulted from the financial aid to the secular programs, since that aid generally strengthened the parochial schools and increased the number of their students.

In view of the decision in *Tilton,* however, where these same factors were found insufficient to invalidate the federal plan, the Court is forced to other considerations. Accepting the District Court's observation in *DiCenso* that education is an integral part of the religious mission of the Catholic church—an observation that should neither surprise nor alarm anyone, especially judges who have already approved substantial aid to parochial schools in various forms—the majority then interposes findings and conclusions that the District Court expressly abjured, namely, that nuns, clerics, and dedicated Catholic laymen unavoidably pose a grave risk in that they might not be able to put aside their religion in the secular classroom. Although stopping short of considering them untrustworthy, the Court concludes that for them the difficulties of avoiding teaching religion along with secular subjects would pose intolerable risks and would in any event entail an unacceptable enforcement regime. Thus, the potential for impermissible fostering of religion in secular classrooms — an untested assumption of the Court — paradoxically renders unacceptable the State's efforts at insuring that secular teachers under religious discipline successfully avoid conflicts between the religious mission

of the school and the secular purpose of the State's education program.

The difficulty with this is twofold. In the first place, it is contrary to the evidence and the District Court's findings in *DiCenso*. The Court points to nothing in this record indicating that any participating teacher had inserted religion into his secular teaching or had had any difficulty in avoiding doing so. The testimony of the teachers was quite the contrary. The District Court expressly found that "[t]his concern for religious values does not necessarily affect the content of secular subjects in diocesan schools. On the contrary, several teachers testified at trial that they did not inject religion into their secular classes, and one teacher deposed that he taught exactly as he had while employed in a public school. This testimony gains added credibility from the fact that several of the teachers were non-Catholics. Moreover, because of the restrictions of Rhode Island's textbook loan law . . . and the explicit requirement of the Salary Supplement Act, teaching materials used by applicants for aid must be approved for use in the public schools." *DiCenso* v. *Robinson*, 316 F. Supp. 112, 117 (RI 1970). Elsewhere, the District Court reiterated that the defect of the Rhode Island statute was "not that religious doctrine overtly intrudes into all instruction," *ibid.*, but factors aside from secular courses plus the fact that good secular teaching was itself essential for implementing the religious mission of the parochial school.

Secondly, the Court accepts the model for the Catholic elementary and secondary schools that was rejected for the Catholic universities or colleges in the *Tilton* case. There it was urged that the Catholic condition of higher learning was an integral part of the religious mission of the church and that these institutions did everything they could to foster the faith. The Court's response was that on the record before it none of

the involved institutions was shown to have complied with the model and that it would not purport to pass on cases not before it. Here, however, the Court strikes down this Rhode Island statute based primarily on its own model and its own suppositions and unsupported views of what is likely to happen in Rhode Island parochial school classrooms, although on this record there is no indication that entanglement difficulties will accompany the salary supplement program.

The Court thus creates an insoluble paradox for the State and the parochial schools. The State cannot finance secular instruction if it permits religion to be taught in the same classroom; but if it exacts a promise that religion not be so taught—a promise the school and its teachers are quite willing and on this record able to give—and enforces it, it is then entangled in the "no entanglement" aspect of the Court's Establishment Clause jurisprudence.

Why the federal program in the *Tilton* case is not embroiled in the same difficulties is never adequately explained. Surely the notion that college students are more mature and resistant to indoctrination is a makeweight, for in *Tilton* there is careful note of the federal condition on funding and the enforcement mechanism available. If religious teaching in federally financed buildings was permitted, the powers of resistance of college students would in no way save the federal scheme. Nor can I imagine the basis for finding college clerics more reliable in keeping promises than their counterparts in elementary and secondary schools—particularly those in the Rhode Island case, since within five years the majority of teachers in Rhode Island parochial schools will be lay persons, many of them non-Catholic.

Both the District Court and this Court in *DiCenso* have seized on the Rhode Island formula for supplementing

teachers' salaries since it requires the State to verify the amount of school money spent for secular as distinguished from religious purposes. Only teachers in those schools having per-pupil expenditures for secular subjects below the state average qualify under the system, an aspect of the state scheme which is said to provoke serious "entanglement." But this is also a slender reed on which to strike down this law, for as the District Court found, only once since the inception of the program has it been necessary to segregate expenditures in this manner.

The District Court also focused on the recurring nature of payments by the State of Rhode Island; salaries must be supplemented and money appropriated every year and hence the opportunity for controversy and friction over state aid to religious schools will constantly remain before the State. The Court in *DiCenso* adopts this theme, and makes much of the fact that under the federal scheme the grant to a religious institution is a one-time matter. But this argument is without real force. It is apparent that federal interest in any grant will be a continuing one since the conditions attached to the grant must be enforced. More important, the federal grant program is an ongoing one. The same grant will not be repeated, but new ones to the same or different schools will be made year after year. Thus the same potential for recurring political controversy accompanies the federal program. Rhode Island may have the problem of appropriating money each year to supplement the salaries of teachers, but the United States must each year seek financing for the new grants it desires to make and must supervise the ones already on the record.

With respect to Pennsylvania, the Court, accepting as true the factual allegations of the complaint, as it must for purposes of a motion to dismiss, would reverse the dismissal of the complaint and invalidate the legislation.

The critical allegations, as paraphrased by the Court, are that "the church-related elementary and secondary schools are controlled by religious organizations, have the purpose of propagating and promoting a particular religious faith, and conduct their operations to fulfill that purpose." *Ante,* at 620. From these allegations the Court concludes that forbidden entanglements would follow from enforcing compliance with the secular purpose for which the state money is being paid.

I disagree. There is no specific allegation in the complaint that sectarian teaching does or would invade secular classes supported by state funds. That the schools are operated to promote a particular religion is quite consistent with the view that secular teaching devoid of religious instruction can successfully be maintained, for good secular instruction is, as Judge Coffin wrote for the District Court in the Rhode Island case, essential to the success of the religious mission of the parochial school. I would no more here than in the Rhode Island case substitute presumption for proof that religion is or would be taught in state-financed secular courses or assume that enforcement measures would be so extensive as to border on a free exercise violation. We should not forget that the Pennsylvania statute does not compel church schools to accept state funds. I cannot hold that the First Amendment forbids an agreement between the school and the State that the state funds would be used only to teach secular subjects.

I do agree, however, that the complaint should not have been dismissed for failure to state a cause of action. Although it did not specifically allege that the schools involved mixed religious teaching with secular subjects, the complaint did allege that the schools were operated to fulfill religious purposes and one of the legal theories stated in the complaint was that the Pennsylvania Act "finances and participates in the blending of sectarian

and secular instruction." At trial under this complaint, evidence showing such a blend in a course supported by state funds would appear to be admissible and, if credited, would establish financing of religious instruction by the State. Hence, I would reverse the judgment of the District Court and remand the case for trial, thereby holding the Pennsylvania legislation valid on its face but leaving open the question of its validity as applied to the particular facts of this case.

I find it very difficult to follow the distinction between the federal and state programs in terms of their First Amendment acceptability. My difficulty is not surprising, since there is frank acknowledgment that "we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication," *Tilton* v. *Richardson, post,* at 678, and that "[j]udicial caveats against entanglement" are a "blurred, indistinct and variable barrier." *Ante,* at 614. I find it even more difficult, with these acknowledgments in mind, to understand how the Court can accept the considered judgment of Congress that its program is constitutional and yet reject the equally considered decisions of the Rhode Island and Pennsylvania legislatures that their programs represent a constitutionally acceptable accommodation between church and state.[2]

---

[2] As a postscript I should note that both the federal and state cases are decided on specified Establishment Clause considerations, without reaching the questions that would be presented if the evidence in any of these cases showed that any of the involved schools restricted entry on racial or religious grounds or required all students gaining admission to receive instruction in the tenets of a particular faith. For myself, if such proof were made, the legislation would to that extent be unconstitutional.