548 A.2d 328

Roman Catholic Archdiocese of Philadelphia and St. Stephen's Parish, Petitioners *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission et al., Respondents.

Argued June 15, 1988, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and McGINLEY.

*Philip J. Murren, Ball, Skelly, Murren & Connell,* with him, *Sandra A. Girifalco* and *James K. Grasty, Stradley, Ronon, Stevens and Young,* for petitioners.

*Theresa Homisak,* Assistant Chief Counsel, for respondent.

OPINION BY JUDGE BARRY, September 15, 1988:

This case involves interlocutory orders of the Motions Commissioner of the Pennsylvania Human Relations Commission. The cases concern racial or ethnic discrimination allegedly perpetrated by Roman Catholic schools operated by the Roman Catholic Archdiocese of Philadelphia. The complaint at Docket No. P-2175,

*Shirley Harris, on behalf of her minor daughter, Catrina Harris v. John W. Hallahan High School.* alleges harsh disciplinary actions against Catrina Harris by the nuns at the school because of her race, sanctions which were not invoked against white students. The case of *Vernell L. Sebrell, on behalf of his minor son, Philip D. Sebrell v. St. Stephen's School,* Docket No. P-2416, alleges constant harassment and humiliation because of the minor's black race and Baptist Christian religion. The case of *Jose Torres, on behalf of his minor son, Michael Torres v. Northeast Catholic High School for Boys,* Docket No. P-2636 alleges harassment and assault of Michael Torres because of his Hispanic origin by fellow students at the school who were not appropriately disciplined because they were not Hispanic. The case of *Delores T. Martin, on behalf of her minor daughter, Tonya James and others similarly situated v. Lansdale Catholic High School,* Docket No. P-2691 alleges that the head coach of the Lansdale female basketball team made offensive and racially discriminatory remarks directed at Tonya James, who is a member of the Pottstown girls' basketball team.

The appellants denied the allegations in the various complaints and also filed motions to dismiss. By four orders dated November 23, 1987, the Motions Commissioner denied the motions to dismiss. Leave was given by the Motions Commissioner to appeal the interlocutory orders involved. Permission to appeal these orders was granted by this Court on January 11, 1988. The appellants contend that the Catholic church-schools involved are not places of "public accommodation, resort or amusement" within the meaning of the Pennsylvania Human Relations Act. Act of February 28, 1961, P.L. 47 §2, 43 P.S. 755(1)(i). They also claim a violation of the Free Exercise and Establishment Clauses of the First Amendment to the Constitution of the United

States. The appellee contends none of the incidents complained of concern or even touch upon matters peculiar to the religion of the operators of the schools and that the Commission is required by statute to accept such complaints, to embark on mandated investigation, and if appropriate to remedy the complained of practices. Appellee contends that the Pennsylvania Human Relations Act lists schools as within the purview of the public accommodation sections of the Act without limitation or qualification as to private or sectarian schools. Appellee further contends that the only exclusion that could be applicable to such institutions would require a showing that these schools are "distinctly private" which the appellants' church run schools cannot demonstrate.

At issue is Section 4(l) 43 P.S. Section 954(l) which states:

(l) The term 'public accommodation, resort or amusement' means any accommodation, resort or amusement which is open to, accepts or solicits the patronage of the general public, including but not limited to inns, taverns, roadhouses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest, or restaurants or eating houses, or any place where food is sold for consumption on the premises, buffets, saloons, barrooms or any store, park or enclosure where spirituous or malt liquors are sold, ice cream parlors, confectioneries, soda fountains and all stores where ice cream and fruit preparations or their derivatives, or where beverages of any kind are retailed for consumption on the premises, drug stores, dispensaries, clinics, hospitals, bathhouses, swimming pools, barber shops, beauty parlors, retail stores and establishments, theatres, motion pic-

ture houses, airdromes, roof gardens, music halls, race courses, skating rinks, amusement and recreation parks, fairs, bowling alleys, gymnasiums, shooting galleries, billiard. and pool parlors, public libraries, kindergartens, primary and secondary schools, high schools, academies, colleges and universities, extension courses and all educational institutions under the supervision of the Commonwealth, nonsectarian cemeteries, garages and all public conveyances operated on land or water or in the air as well as the stations, terminals and airports thereof, financial institutions and all Commonwealth facilities and services, including such facilities and services of all political subdivisions thereof, but shall not include any accommodations which are in their nature distinctly private.

We have set forth the entire text of the definition because in interpreting section 4 the long list of types of accommodation obviously does not say "parochial schools" and the legal maxim "expressio unius est exclusio alterius" may govern in this instance.

The Motions Commissioner in each of the four cases involved points out that appellants clearly acknowledge that students who are not Catholic are admitted into the schools and concludes that the schools are not "distinctly private".

The appellants in their brief counter-argue that the church-schools are the principal organs for the transmission of the Catholic faith to new generations of Catholics. They cite various documents of the Vatican II Council of 1965 and statements and publications of the Catholic Bishops of the United States Conference for this purpose. However, in the present posture of this case, where no testimony has been taken and we are concerned only with preliminary motions, the Court is

not able to consider any of these sources which are not in evidence and which are not part of the record. We note, however, the case of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which involved the issue of whether the religion clauses of the First Amendment were violated by state statutes which provided state aid to church-related elementary and secondary schools, and to teachers therein, with regard to instruction in secular matters. Finding the statutes violated the First Amendment, the Court made the following observation on the findings of the district court which had

> concluded that the parochial schools constituted an 'integral part of the religious mission of the Catholic Church'. The various characteristics of the schools make them 'a powerful vehicle for transmitting the Catholic faith to the next generation'. This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly. In short, parochial schools involve substantial religious activity and purpose.

*Lemon* at 616. The concurring opinion of Mr. Justice DOUGLAS, joined by Mr. Justice BLACK, also points out:

> The analysis of the constitutional objections to these two state systems of grants to parochial or sectarian schools must start with the admitted and obvious fact the raison d'etre of parochial schools is the propagation of religious faith.

*Lemon* at 628. We outline the orientation of these schools not at this point to discuss the constitutional issues raised by the appellants but to point out that their religious character supports the appellants' argument that they are "distinctly private" in nature.

The Supreme Court of the United States quoted with approval Mr. Justice DOUGLAS's language in his concurring opinion in *Lemon* when it ruled that teachers in

church operated schools were not within the coverage of the National Labor Relations Act. 29 U.S.C. §151, *National Labor Relations Board v. Catholic Bishop of Chicago,* 440 U.S. 490 (1979), so that the NLRB had no jurisdiction over teachers' unions in church operated schools. In that case the National Labor Relations Board argued that jurisdiction should attach because the schools chose to entangle themselves with the secular world when they decided to hire lay teachers. We discuss this case only in the broad context of trying to arrive at a meaning of the term "distinctly private". The appellees' brief, we believe, correctly and succinctly sets forth the appellants' policy in regard to the admission of non-Catholic students from the general public to the four schools involved:

> Appellants' church schools undeniably do accept non-Catholic students from the general public to fill whatever vacant spaces remain in schools to maximize tuition revenue potential. The fact that these non-Catholics, as a condition of receiving education in the church schools must take religion classes and attend services, does not transmute the experience into one "distinctly private."

Appellants point to remarks of Representative Herbert Fineman, *Legislative Journal—House,* April 5, 1961 page 992 which purport to exclude religious and denominational educational institutions from the term "public accommodation". We note, however, that comments of individual legislators during debate on legislative bills are not indicative of the legislative intent behind the bill. *Hoffman v. Pennsylvania Crime Victims' Compensation Board,* 46 Pa. Commonwealth Ct. 54, 405 A.2d 1110 (1979), *Beers v. Unemployment Compensation Board of Review,* 118 Pa. Commonwealth Ct. 248, 546 A.2d 1260 (1988).

The appellants point out that this is not a case which tests whether Catholic schools are free to refuse to enroll students on the basis of race. Section 1521 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §15-1521 decrees that they may not. The statute, it is to be noted, states *"no public or private school* shall refuse to enroll any students because of race or color."* Appellants also contend that they will become subject to restrictions against disparate educational treatment of handicapped or learning disabled children, whether the schools are capable of assisting such children or not. Also, single sex secondary schools, of the type now operated by Catholic dioceses throughout Pennsylvania, would be subject to Commission review. Indeed the commission in its brief states that

> Should changes as to these matters be mandated, appellants will suffer an organizational and economic burden from which they would understandably prefer to insulate themselves. However, the result of such a determination by this court would be to deny the protection of Pennsylvania anti-discrimination law to numerous children. It is clear from the law previously cited that appellants cannot enjoy the absolute freedom to act, free from regulation, that they seek.

Upon consideration of the excellent briefs and arguments of all parties to this litigation, the Court on balance reaches the conclusion that the contention of the appellants is correct and that their schools are not "public accommodations" as defined in Section 954(1) of the Pennsylvania Human Relations Act.

We note that the Motions Commissioner declined to address the question whether a review of the appellants' policies would of necessity result in an excessive entanglement of church and state, thereby infringing upon

the appellants' rights to the free exercise of religion as guaranteed by the First Amendment of the United States constitution. In each of the four interlocutory orders the Commissioner properly stated:

> While such a determination may be proper by either the Commonwealth Court or the Pa. Supreme Court, an administrative agency should not independently construe a portion of the act it enforces to be unconstitutional. As an administrative agency, we must assume all portions of the PHRA are constitutional unless instructed otherwide.

We also do not reach the constitutional issues. It is well settled that when a case raises both constitutional and nonconstitutional issues, a court should not reach the constitutional issue if the case can be decided on non-constitutional grounds. *Palue v. State Ethics Commission,* 496 Pa. 127, 436 A.2d 186 (1981).

Accordingly we reverse.

## ORDER.

Now, September 15, 1988, the interlocutory orders of the Motions Commissioner of the Pennsylvania Human Relations Commission at PHRC Docket No. P-2175, PHRC Docket No. P-2416, PHRC Docket No. P-2636, PHRC Docket No. P-2691 are reversed.

Judge DOYLE did not participate in the decision in this case.

---

### DISSENTING OPINION BY JUDGE CRAIG:

Is a sectarian school subject to the civil rights law scrutiny which is applicable to "primary and secondary schools" insofar as the school is "open to" and "accepts . . . the patronage of the general public . . . ." and is therefore not "distinctly private"? Section 4 of the Penn-

sylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended,* (Act) 43 P.S. §954.

Because that statutory definition means that a religious school is a "public accommodation" to the extent that it accepts the patronage of the general public, members of the public who thereby enter the school are not required to leave their civil rights protections behind.

Section 3 of the Act states the substantive rule as follows:

> The opportunity for an individual . . . to obtain all the accommodations, advantages, facilities and privileges of any public accommodation . . . without discrimination because of race, color, religious creed, ancestry, handicap or disability, age, sex, national origin . . . is hereby recognized as and declared to be a civil right which shall be enforceable as set forth in this act.

Applying a civil rights observance duty to the public-serving sector of sectarian education is particularly appropriate today, when many different religious groups are commendably expanding their activities in the basic education of youth and are therefore occupying an increasing role in that indispensable element of the nation's life.

The Free Exercise Clause, which bars government interference with religious beliefs, allows government regulation affecting religious groups when an overriding public interest is involved, and government "has a fundamental, overriding interest in eradicating racial discrimination in education"—including education in religious schools. *Bob Jones University v. United States,* 461 U.S. 574, 604 (1983).

The United States Supreme Court has allowed administrative proceedings by a state anti-discrimination

agency against a religious school (sex discrimination in employment) without federal judicial interference because: "Even religious schools cannot claim to be wholly free from some state regulation." *Ohio Civil Rights Commission v. Dayton Christian Schools*, 447 U.S. 619, 628 (1986).

One argument offered against subjecting the public service sector of religious schools to civil rights regulation is the *de minimis* characterization implicit in quoting a concurring opinion of the United States Supreme Court to the effect that "the *raison d'etre* of parochial schools is the propagation of a religious faith." *Lemon v. Kurtzman*, 403 U.S. 602, 628 (1971). However, *Lemon* dealt with the Establishment Clause, not the Free Exercise Clause at issue here. Moreover, because of the relatively small scope of the parochial school's sector of service to the non-Catholic public, recognition of that sector as constituting a public accommodation entitled to protection against discrimination cannot involve an undue interference with religion by government.

Private schools, as well as public schools, know and acknowledge that they may not refuse "to enroll any students because of race or color." *Runyon v. McCrary*, 427 U.S. 160 (1976); *cf.* §1521 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §15-1521, as to licensed private schools. Although not covered by the holding of *Runyon*, the religious schools involved here express no opposition to that proposition.

But the petitioners here nevertheless oppose application of the Act by the contention that applying the public accommodation designation to their public admissions would necessarily mean that single-gender sectarian schools not in existence would have to become coeducational if they did not forego opening their doors to members of the general public. That is not so. Prohi-

bition of discrimination on the basis of sex does not necessarily negate single-gender education, even in *public* school systems. *Vorchheimer v. School District of Philadelphia*, 532 F.2d 880 (1976), *aff'd* 430 U.S. 703 (1977). Because the existence of a single-gender school does not inevitably amount to discrimination as such among public educational institutions, *a fortiori* such a school would not be automatically held to be discriminatory in private school circles.

There is also the argument that sectarian schools, if they desire to admit enrollees from the general public, would be burdened by being required to insure that handicapped pupils are not excluded by a lack of the physical aids they may need. But if the sectarian school desires to have empty desks occupied by children from the general public, a resulting requirement of accessibility to the handicapped is not unreasonable.

And, for First Amendment reasons now made obvious by the United States Supreme Court, partial coverage of sectarian school operations by the Act could not be applied in any way which would use the severable "religious creed" prohibition of the Act to interfere with the priority of admission due to parishioners or the religious instruction and religious worship which the school is fully entitled to apply to all of its pupils. *Lemon.* Also *see* Pennsylvania Fair Educational Opportunities Act, Act of July 17, 1961, P.L. 776, §4, *as amended*, §4, 24 P.S. §5004(aa)(1).

So long as any sectarian school—whether to serve the whole community or to augment its income, or both —holds itself out to the general public as an educational alternative, it cannot be deemed to be "distinctly private" under section 4 of the Act or exempt from coverage under that classification.

The interlocutory orders of the Motions Commissioner of the Pennsylvania Human Relations Commis-

sion should be affirmed, to apply the civil rights protections of the Act where sectarian schools, as here, accept enrollment from the general public.

Judge MACPHAIL joins in this dissent.

---

DISSENTING OPINION BY JUDGE MACPHAIL:

I respectfully dissent.

I note that the majority opinion reaches its result without addressing the constitutional issues. The majority result is solely based on the conclusion that this particular school is "distinctly private," a conclusion which is contrary to that reached by the Motions Commissioner.

While I enthusiastically applaud the educational value of our parochial schools in today's society, I have great difficulty in agreeing with my learned colleagues that a Catholic school which admits non-Catholic children is "distinctly private" within the common meaning of these words.

In Webster's Third New International Dictionary (1961) "distinctly" is defined, *inter alia,* as "without a blending or merging of one thing with another." The same source defines "private" as "intended for or restricted to the use of a particular person or group or class of persons."

Because the school which is the subject of the present litigation does, to its credit, merge and blend Catholics and non-Catholics, and because it does not restrict its facilities, again to its credit, to persons of Catholic persuasion, I am compelled to conclude that it is subject to the provisions of the Pennsylvania Human Relations Act.

Judge CRAIG joins in this dissent.