[Nos. 22358–5–I; 22360–7–I;   Division One.          January 22, 1990.]
22361–5–I; 22362–3–I;
22610–0–I; 22611–8–I;
22612–6–I; 22709–2–I;
22710–6–I; 22804–8–I.

*In the Matter of the Dependency of J.L.T.*

CHRIS TUCKER, *Appellant,* v. LUTHERAN SOCIAL
SERVICES, *Respondent.*

*In the Matter of the Dependency of J.S.,* ET AL.

GARY SKORSTAD, *Appellant,* v. CATHOLIC COMMUNITY
SERVICES, *Respondent.*

*In the Matter of the Dependency of C.N.,* ET AL.

KATHY NYHART, *Appellant,* v. CATHOLIC COMMUNITY
SERVICES, *Respondent.*

*In the Matter of the Dependency of R.A.,* ET AL.

TERESA AUTIO, *Appellant,* v. LUTHERAN SOCIAL
SERVICES, *Respondent.*

*Anna–Mari Sarkanen* of *Washington Appellate Defender Association,* for appellant Tucker.

*Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant Skorstad.

*Andrew P. Zinner* and *Anna–Mari Sarkanen* of *Washington Appellate Defender Association,* for appellant Nyhart.

*Rita J. Griffith* of *Washington Appellate Defender Association,* for appellant Autio.

*Brian Linn,* for respondent Lutheran Social Services.

*Patrick A. Geraghty, Jr.,* for respondent Catholic Community Services.

*Thomas G. Burke, Mark A. Heinrich, Patrick B. Anderson,* and *Hall Baetz,* for the children.

SWANSON, J.—In this consolidated appeal Chris Tucker, Gary Skorstad, Kathleen Nyhart, and Teresa Autio (referred to collectively as the parents) challenge orders terminating their parental rights in a total of 10 children. The respondent in each case is either Lutheran Social Services (LSS) or Catholic Community Services (CCS) (referred to collectively as the Agencies).

The primary issue is the parents' assertion that allowing religiously affiliated child welfare agencies to file termination petitions impermissibly entangles church and state in violation of the establishment clause of the First

Amendment.[1] We can find no indication in the record that this issue was raised below. Nor have appellants identified the basis upon which this court should review the question. Generally, in civil cases, constitutional issues not presented at trial will not be considered on appeal unless the issue involves jurisdiction of the court. *Department of Labor & Indus. v. Wendt,* 47 Wn. App. 427, 431, 735 P.2d 1334 (declining to reach equal protection claim), *review denied,* 108 Wn.2d 1034 (1987). Termination proceedings, however, which affect fundamental liberty interests, are not strictly "civil" in nature. *See In re Luscier,* 84 Wn.2d 135, 138–39, 524 P.2d 906 (1974) (indigent parents entitled to counsel at public expense for termination proceedings). Appellants thus appear to assume that the issue falls within the narrow confines of RAP 2.5(a)(3) as a "manifest error affecting a constitutional right."

We note initially that the parents' challenge is narrow. The assignment of error is directed solely to RCW 13.34-.180, which permits any party to the dependency proceedings to file termination petitions. The parents do not otherwise challenge the Agencies' participation throughout the dependency proceedings; nor is there any explicit challenge to Washington's broad statutory scheme governing the relationship between DSHS and private child welfare agencies in dependency matters. *See generally In re Ramquist,* 52 Wn. App. 854, 858–59, 765 P.2d 30 (1988), *review denied,* 112 Wn.2d 1006 (1989).

In addition, because the issue was not raised below, the record contains no factual basis upon which to assess the parents' arguments. The parties appear to agree that CCS and LSS are "religiously affiliated" child welfare agencies, but the nature of that affiliation is unclear. The parents ultimately ask this court to rule on the constitutionality of RCW 13.34.180 based solely on the names of the Agencies

---

[1]The parents have not raised any argument based on article 1, section 11 of the Washington Constitution. *See generally Witters v. Commission for the Blind,* 112 Wn.2d 363, 771 P.2d 1119, *cert. denied,* 110 S. Ct. 147 (1989).

and the fact that CCS is "listed under the Catholic Archdiocese of Seattle in the telephone directory . . .". Given the nature of the challenge in this case, we fail to see how we can adequately discuss the concept of "entanglement," much less "excessive entanglement," without knowing something about the Agencies.[2]

■ The constraints imposed by the record become apparent when the legal criteria governing establishment clause challenges are considered. In *Lemon v. Kurtzman,* 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971), the United States Supreme Court set forth three "tests" for determining whether a government practice violates the establishment clause. Under the *Lemon* analysis

a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion.

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,* __ U.S. __, 106 L. Ed. 2d 472, 109 S. Ct. 3086, 3100 (1989) (display of creche violated establishment clause; upholding display of menorah next to Christmas tree). The *Lemon* analysis has been utilized in this state. *See, e.g., Bill of Rights Legal Found. v. Evergreen State College,* 44 Wn. App. 690, 694, 723 P.2d 483 (1986) (joint sponsorship of lecture series by state college and church did not violate establishment clause).

■ The parents do not suggest that the first two tests in the *Lemon* analysis are appropriate here. Rather, they maintain that permitting religiously affiliated agencies to file termination petitions violates the third *Lemon* test by fostering excessive entanglement between church and state. The *Lemon* Court set forth three factors that are relevant in determining whether government action involves "excessive entanglement" with religion:

---

[2]There is no contention that RCW 13.34.180 violated the establishment clause as applied. *See generally Bowen v. Kendrick,* 487 U.S. 589, 101 L. Ed. 2d 520, 108 S. Ct. 2562 (1988).

the character and purposes of the benefited institution, the nature of the aid the state provides, and the resulting relationship between the state and the religious institution.

*Bill of Rights Legal Found.*, at 694 (citing *Lemon*). Here, the absence of a proper factual record precludes any analysis of the first two factors. *Cf. Bill of Rights Legal Found.*

The parents speculate that RCW 13.34.180 fosters excessive entanglement because religiously affiliated child welfare agencies may threaten to use the "power" to file termination petitions as a coercive tool for furthering religious goals or beliefs, such as inducing certain forms of behavior among the parents of dependent children. Any attempt to ensure that such "power" is exercised in a religiously neutral manner, the parents maintain, would require administrative methods that only increase impermissible entanglement. Finally, the parents claim that the mere appearance of a joint enterprise by religious and government agencies engenders a symbolic link within the minds of the public.

■ The parents' reliance on *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 74 L. Ed. 2d 297, 103 S. Ct. 505 (1982) is misplaced. In *Grendel's Den*, the United States Supreme Court held that a Massachusetts statute granting to schools and churches the power to veto liquor license applications for premises within a 500-foot radius of the church or school violated the establishment clause. In reaching its decision, the Court observed:

[The challenged statute] substitutes the unilateral and absolute power of a church for the reasoned decisionmaking of a public legislative body acting on evidence and guided by standards, on issues with significant economic and political implications. The challenged statute thus enmeshes churches in the processes of government and creates the danger of "[p]olitical fragmentation and divisiveness on religious lines". Ordinary human experience and a long line of cases teach that few entanglements could be more offensive to the spirit of the Constitution.

*Grendel's Den*, 459 U.S. at 127 (quoting *Lemon v. Kurtzman, supra*).

Appellants analogize the power to veto liquor license applications, the issue in *Grendel's Den*, to the "power" to

*file* a termination petition. Such an approach, however, obscures the fact that it is the court, not the petitioner, that makes the termination decision; the identity of the petitioner is essentially irrelevant for purposes of the ultimate decision. Moreover, unlike the situation in *Grendel's Den,* the court renders its decision based on the evidence and guided by extensive, religiously neutral statutory criteria.

At oral argument, counsel for the parents insisted that the statute at issue in *Grendel's Den* did not grant the churches an absolute power to veto liquor license applications but merely permitted churches to file an objection. Counsel correctly noted that the license commission's denial of the application in *Grendel's Den* was upheld by the state alcoholic beverages control commission. *See Grendel's Den,* 459 U.S. at 118.

The fact that the denial of the application in *Grendel's Den* was subject to review, however, was irrelevant for purposes of the opinion. The Court's decision rests on the characterization that the statute at issue granted churches "the power effectively to veto applications for liquor licenses . . .". *Grendel's Den,* 459 U.S. at 117. The Supreme Court further adopted as controlling the construction of the statute by the Massachusetts Supreme Judicial Court to the effect that the statute "delegates to private, nongovernmental entities power to veto certain liquor license applications." *Grendel's Den,* 459 U.S. at 122. Thus, the *filing* of the objection to a liquor license application in *Grendel's Den,* unlike the filing of a termination petition, essentially determined the outcome of the proceeding. In effect, appellants ask this court to adopt the reasoning in *Grendel's Den,* but reject or recharacterize the critical assumption on which it is based.

In *Bowen v. Kendrick,* 487 U.S. 589, 101 L. Ed. 2d 520, 108 S. Ct. 2562 (1988), the Supreme Court rejected a facial establishment clause challenge to the Adolescent Family Life Act (AFLA), an act providing direct grants to public

and private agencies, including religiously affiliated agencies, for services and research in the area of premarital adolescent sexual relations and pregnancy. *See Bowen,* 487 U.S. at 593. Conceding that religious institutions could participate as grantees under the program and that services provided by such organizations, including counseling, could coincide with the approach of certain religions, the Court nonetheless concluded that the act could at best be regarded as having an "incidental and remote" effect for purposes of advancing religions. The *Bowen* Court then proceeded to reject the argument, raised here as well, that the AFLA had the effect of creating a "crucial symbolic link" between government and religion:

> If we were to adopt [such] reasoning, it could be argued that any time a government aid program provides funding to religious organizations in an area in which the organization also has an interest, an impermissible "symbolic link" could be created, no matter whether the aid was to be used solely for secular purposes. This would jeopardize Government aid to religiously affiliated hospitals, for example, on the ground that patients would perceive a "symbolic link" between the hospital—part of whose "religious mission" might be to save lives—and whatever government entity is subsidizing the purely secular medical services provided to the patient.

*Bowen,* 487 U.S. at 613. Similarly, whatever "symbolic link" may arise from the mere filing of a termination petition by religiously affiliated child welfare agencies, it is insufficient to render RCW 13.34.180 unconstitutional on its face. The parents here have not suggested that the Agencies discriminate on the basis of religion or that their services are provided in a pervasively sectarian fashion.

In summary, permitting religiously affiliated child welfare agencies to *file* parental termination petitions does not involve the type of excessive entanglement of church and state that raises establishment clause concerns. Because the alleged error as framed in this appeal is not "truly of constitutional magnitude," the issue may not be raised for the first time on appeal. *See State v. Scott,* 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

In an argument not joined by the other parents, appellant Skorstad contends that CCS lacked standing to file the petition for termination. Prior to 1988, RCW 13.34.180 and 13.34.130(3)(c) provided only that a termination petition could "be filed." In 1988, RCW 13.34.180 was amended to provide that a termination petition "may be filed . . . by *any* party to the dependency proceedings . . .". (Italics ours.) *See* Laws of 1988, ch. 201, § 2.

In *In re Ramquist, supra,* this court examined the broad statutory scheme governing dependency, termination, and child welfare agencies and found a legislative policy favoring "liberal standing in the case of termination." *Ramquist,* at 857–58. Based upon a review of the relevant statutes, we concluded that former RCW 13.34.180 granted standing to private child–placing agencies to file termination petitions: "The 1988 amendment simply confirms what was implicit in the statutory scheme." *Ramquist,* at 859. In the alternative, the *Ramquist* court held that the 1988 amendment to RCW 13.34.180 applied retroactively.

*Ramquist* controls Skorstad's standing argument. Pursuant to RCW 13.34.180, CCS and LSS, as parties to the dependency proceedings in each case, had standing to file termination petitions.

In addition to the constitutional issue, appellant Nyhart challenges the sufficiency of the evidence supporting termination of her parental rights in C, D, and R. Prior to entering an order terminating parental rights, the trial court must find (1) that the allegations set forth in RCW 13.34.180(1) through (6) have been established by "clear, cogent, and convincing evidence" and (2) that termination is in the best interests of the child. RCW 13.34.190(1)(a), (2). The trial court's findings on the requirements of RCW 13.34.180 must be upheld if they are supported by "clear, cogent, and convincing" evidence. *In re Ramquist, supra* at 860. Because the parties are thoroughly familiar with the evidence in the record, we will not rehearse it here.

Nyhart first contends that there was insufficient evidence to support the trial court's finding that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided . . .". RCW 13.34.180(4). She maintains that CCS failed to arrange financial assistance to permit her to visit her children and failed to consider her mother for possible placement of the children.

The evidence in the record regarding the seriousness of Nyhart's attempts to visit her children while she was living in Spokane was disputed. The trial court's finding that Nyhart failed to follow through with making arrangements for a visit is amply supported. Moreover, even if it is assumed that CCS should have made some additional effort to provide travel assistance, the evidence was overwhelming that such services were not capable of correcting Nyhart's parental deficiencies within the "foreseeable future." *See In re Hall*, 99 Wn.2d 842, 664 P.2d 1245 (1983).

The record also shows that CCS did consider placement of the children in the home of Nyhart's mother. Placement was rejected, however, because Nyhart's mother already operated an adult care facility for four adults on one floor of her home. The CCS caseworker felt that Nyhart's mother could not provide a suitable environment for the children's special needs.

Nyhart's final contention is that the trial court failed to review a social study prior to entering the agreed orders of dependency. RCW 13.34.110 requires the trial court to review a social study (and a predisposition study in cases of dependency pursuant to RCW 13.34.030(2)(c)) prior to entry of an agreed order. *See In re Ferguson*, 41 Wn. App. 1, 5, 701 P.2d 513, *review denied*, 104 Wn.2d 1008 (1985). The failure to prepare a social study, however, does not invalidate an agreed order of dependency when there is substantial compliance with the statute and no resulting prejudice. *Cf. In re Ferguson, supra.*

Here, each of the agreed orders of dependency identified the reasons underlying the dependency and contained a dispositional plan and order reciting the services to be provided and the behavior expected of the parent. Subsequent agreed dependency review orders were entered in each case. Nyhart has not suggested that she did not understand which services were available or what was required of her. Consequently, even if it is assumed that the trial court did not review a social study, no prejudice occurred. *Cf. In re Ferguson, supra.*

Judgment affirmed.

SCHOLFIELD and FORREST, JJ., concur.

Review denied at 114 Wn.2d 1020 (1990).