[No. 25330-1-I.  Division One.  January 13, 1992.]

*In the Matter of the Dependency of* A.D.C.

LUTHERAN SOCIAL SERVICES OF WASHINGTON AND IDAHO, INC., *Respondent*, v. RICHARD KEENE LUDDEN II, *Appellant*.

711

*Irene Tanabe* of *Washington Appellate Defender Association,* for appellant.

*Brian J. Linn* and *Law Offices of Linn & Schisel,* for respondent.

SCHOLFIELD, J. — Richard Ludden appeals the trial court's order terminating the parent-child relationship between himself and his daughter, A.D.C. We affirm.

FACTS

A dependency petition was filed in this matter on November 4, 1988. According to the petition, Child Protective Services (CPS) in Whatcom County received a report alleging severe neglect of a 3-week-old child. The report indicated that the mother was a cocaine abuser, and she had left the child with known drug abusers in Bellingham while she went to Seattle for her welfare check. The location given by the informant was apparently that of the baby's presumed father, Richard Ludden.

CPS did a check of the residence and found extremely cramped quarters, stifling heat, and drug paraphernalia scattered around. There were cigarette butts and spilled ashtrays on the floor, and the kitchen counters were loaded with various pieces of equipment. The baby, A.D.C., was in a bassinet on the floor in a small hallway. She had a bottle that was propped up by a dirty rag on her chest. The bottle had not been washed and contained crusty dried formula. The child was dressed in four or five layers of clothing, all of which were spotted with dried feces. She was extremely wet from sweat and urine, and had feces covering her bottom and legs. The caseworker also noticed a bright red diaper rash, accompanied by white blisters on the baby's thighs.

Ludden was present and appeared to be under the influence of alcohol and/or drugs. He had difficulty answering the questions of the police officer who accompanied the caseworker, and he appeared unfocused and confused. The caseworker testified that she noticed Ludden's breath smelled of alcohol, and his eyes were bloodshot and dilated. When the caseworker asked him for a clean rag for wiping the baby, Ludden produced a greasy black rag. Two other adults were present at the residence — a 50-year-old woman who was drawing pictures with crayons, and a young man who was extremely concerned about a possible drug bust.

A.D.C. was placed in shelter care. The evening after the child's placement, she experienced violent quivering of her

arms and legs, accompanied by loud shrieking. During this time, A.D.C. could not be comforted. Apparently, such activity may be indicative of cocaine withdrawal.

The record indicates that on November 7, 1988, both Ludden and the mother, Melissa Courchene, were personally served with a copy of the petition and notice of hearing in the dependency case. Findings of fact, conclusions of law and an order of dependency were entered in Whatcom County on December 2, 1988.

A dispositional order was entered on March 7, 1989. This order required both the mother and the father to accomplish certain items and required the supervising agency to provide certain services. Because Ms. Courchene is not a party to this appeal, this court need not concern itself with dispositional items applying only to her. The order provided in pertinent part:

8. Father shall address all criminal matters pending against him and then abstain from further illegal activities.
9. Father shall complete a drug/alcohol evaluation and follow through with prescribed treatment plan.
10. Father shall establish and maintain consistent contact with the caseworker and agency.
11. If visitations are possible, father shall adhere to a regular visitation schedule.
12. Once father has established sobriety and involvement in treatment he must participate in parenting class.
13. Father shall establish paternity.
14. Supervising agency will provide casework services.
15. Supervising agency will provide the child with all necessary and emergent medical, dental and psychiatric evaluations/treatment.
16. Supervising agency will provide mother with regular visitation and will attempt to provide the father with contact by working with the criminal justice system.
17. Supervising agency will address permanency needs of the child in a timely manner to prevent psychological damage to the child.

On that same date, jurisdiction was transferred from Whatcom County to King County. Since the mother was residing in King County, the child had been placed in foster care in King County, and Lutheran Social Services (hereinafter

LSS), located in King County, had agreed to provide supervision of the case.

In July 1989, LSS petitioned the court for termination of the parent-child relationship as to both parents. Although not served with a summons, Ludden was personally served with the Petition for Termination of Parent-Child Relationship on July 28, 1989. The termination hearing was held in November 1989.

The trial court's undisputed findings indicated that:

8. . . . With the exception of Mr. Ludden's efforts in May, June and July of 1989 (see paragraph 22 below), neither parent followed through with the requirements of the dispositional plan.

9. A Dependency Review Hearing Order was entered with respect to the father on May 9, 1989. In that Order, the father agreed to all of the provisions previously provided for in the dispositional plan, except for the requirement of parenting classes which was deleted. The father has failed to follow through on the May 9, 1989 Order, except to the extent indicated in Paragraph 22 below.

. . . .

11. On July 27, 1989 a Dependency Review Hearing Order was entered with respect to both parents. Neither parent appeared at the time of that hearing; however, both parents were represented by legal counsel. The Court required that the two previous Review Hearing Orders remain in full force and effect and, further, that Lutheran Social Services of Washington and Idaho would have the authority to request random urinalysis for both parents and to perform blood testing as to paternity. The father was required to complete a psychological evaluation.

12. Neither parent has maintained regular contact with Lutheran Social Services of Washington and Idaho since the last Court Hearing on July 27, 1989. One random urinalysis was performed on the father, and he tested positive for amphetamine and methamphetamine usage. He has not obtained the psychological evaluation. . . .

. . . .

17. Both parents have failed to follow through with available services d[e]signed to assist them with their alcohol and drug problems except to the extent indicated in Paragraph 22 below.

. . . .

20. Richard K. Ludden has a long history of criminal activity, and he has had a number of incarcerations since the placement of [A.D.C.].

21. Mr. Ludden has exercised only two visitations with the child since she was placed in care on November 1, 1988. One visit occurred on November 3, 1988, and the other occurred on June 28, 1989.

22. Richard K. Ludden did make an effort during May, June and July, 1989 to follow-through with the Court Orders; however, he failed to sustain that effort. During this time period and throughout the case, Linda Katz [LSS program director] made a good-faith effort to provide services to Mr. Ludden and she did offer services to him.

Other findings entered by the trial court are disputed by Ludden, but based on a review of the record, we hold that they are supported by substantial evidence.[1] These findings indicated that:

18. Both parents have been uncooperative with the Department of Social and Health Services and Lutheran Social Services of Washington and Idaho, Inc., and both parents have failed to even maintain ongoing and regular contact and communication with the social service agencies having custody of their child.

. . . .
24. Neither parent appears able or willing to change the lifestyle which they have engaged in for many years. That lifestyle involves itself with criminal activity, drugs, alcohol and unstable living conditions. Neither parent can provide safety, dependability or nurturance for their child.

Ludden testified on his own behalf at the termination hearing. He stated that the reason the agencies had not given him back his child was that he still drove a Harley-Davidson motorcycle, and that he had not moved from Bellingham to Seattle. He indicated that he was able to be a parent to his child and needed no services or assistance to do so. He further stated that he did not believe that the child would have any adverse reactions if she were to be placed with him, even though she was only 13 months old and he had only seen her twice. He also stated that despite

---

[1] Where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the finding of the trial court. *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 638 P.2d 1231 (1982). Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *In re Snyder*, 85 Wn.2d 182, 532 P.2d 278 (1975).

his history of drug use, he did not feel he had an immediate problem requiring treatment.

Ludden's pretrial motion to dismiss, which had been reserved, was argued following the presentation of all testimony. Ludden contended that LSS did not have standing to bring a termination petition, and he argued that substituting LSS for the Department of Social and Health Services (DSHS) violated the First Amendment. The trial court denied the motion, finding that LSS was a party with standing to bring a termination petition, and making the following findings with respect to LSS's status as a religiously affiliated organization:

47. The Articles of Incorporation of the private agency demonstrate that it was established for religious purposes to pursue its Christian mission; however, those are only broad, general purposes.

48. The policies of the Board of Directors of Lutheran Social Services of Washington and Idaho, Inc., do not affect the social services given by the agency in any particular case, including the case of [A.D.C.] and her parents.

49. The Program Director for Children's Services [of LSS], Linda Katz, is not a Lutheran, and most of the social workers are also not Lutheran.

50. The legislative enactment in R.C.W. Chapter 13.34 has an entirely secular purpose, and that secular purpose rather than any specific religious purpose, has been pursued by Lutheran Social Services of Washington and Idaho, Inc.

The order terminating the parent-child relationship between Ludden and A.D.C. was entered on December 13, 1989. This appeal timely followed.

### FIRST AMENDMENT

The first amendment to the United States Constitution states in pertinent part that "Congress shall make no law respecting an establishment of religion . . .".

■ *Lemon v. Kurtzman*, 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971) set forth three criteria for determining whether a government practice violates the establishment clause of the First Amendment. The *Lemon* Court stated as follows:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

(Citations omitted.) *Lemon*, at 612-13. Ludden concedes that the statutory scheme allowing DSHS to place a dependent child into the custody, control, and care of private, licensed child placement agencies, including religiously affiliated ones, does have a valid secular purpose.

However, Ludden contends that LSS's participation in the dependency process has the primary effect of advancing religion, and the involvement fosters entanglement with religion. A Washington case that addressed, but did not resolve, these issues was *In re J.L.T.*, 56 Wn. App. 682, 785 P.2d 829, *review denied*, 114 Wn.2d 1020 (1990). In that case, parents whose parental rights had been terminated asserted that allowing religiously affiliated child welfare agencies to file termination petitions impermissibly entangled church and state, in violation of the establishment clause of the First Amendment.

Although the holding in *J.L.T.* was based on the fact that the issue was not raised in the trial court below and on the fact that the appellants asked the Court of Appeals to rule on the establishment clause issue based solely on the names of the agencies (Catholic Community Services and Lutheran Social Services), the *J.L.T.* court analysis is instructive. The parents in *J.L.T.* contended that RCW 13.34.180 fosters excessive entanglement with religion because religiously affiliated child welfare agencies might threaten to use their power to file termination petitions to induce parents to comply with certain religious practices. *J.L.T.*, at 686-87.

The parents cited *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 74 L. Ed. 2d 297, 103 S. Ct. 505 (1982) in support of their position. In that case, the United States Supreme Court held that a Massachusetts statute granting schools and churches the right to veto liquor license applications for premises located within a 500-foot radius of the school or

church building violated the establishment clause. *Grendel's Den*, at 127.

According to the *Grendel's Den* Court, the challenged statute:

> substitutes the unilateral and absolute power of a church for the reasoned decisionmaking of a public legislative body acting on evidence and guided by standards, on issues with significant economic and political implications. The challenged statute thus enmeshes churches in the processes of government and creates the danger of "[p]olitical fragmentation and divisiveness on religious lines," . . ..

(Citation omitted.) *Grendel's Den*, at 127.

In *J.L.T.*, the parents analogized the power to veto the liquor license applications to the ability to file a petition terminating parental rights. The *J.L.T.* court disagreed, stating that in a termination case, the court, not the petitioner, makes the termination decision. *J.L.T.*, at 688.

Counsel for the parents noted that the statute at issue in *Grendel's Den* did not give churches the absolute power to veto liquor licenses because review of the denial of a liquor license application was available. The *J.L.T.* court noted that this fact was irrelevant for purposes of the *Grendel's Den* opinion because the filing of the objection "essentially determined the outcome of the proceeding", and the *J.L.T.* court remarked that this is not true when a petition for termination of parental rights is filed. *J.L.T.*, at 688. The *J.L.T.* court stated that permitting religiously affiliated agencies to file termination petitions does not involve the excessive entanglement of church and state. *J.L.T.*, at 689.

■ Applying the law as set forth in *Grendel's Den* and the rationale set forth in *J.L.T.*, we hold that excessive entanglement of government and religion has not occurred through LSS's participation in the dependency and termination process. All of the discretionary decisions made in this case relative to the parent-child relationship have been made by either DSHS or the courts. These include the removal of A.D.C. from Ludden's home, the filing of the

dependency petition, the finding of dependency, the dispositional decisions, and the termination decision.

■ The only discretionary decision made by LSS was whether to file the termination petition, and that specific portion of the statute was found not to create excessive entanglement in *J.L.T.* The other activities conducted by LSS were the licensing and supervision of foster placement for A.D.C. and the provision of services to Ludden and Courchene. In no way can these activities be construed to involve government in religion or involve religion in government, especially considering the trial court's findings that despite the broad general goals of LSS, it carried out the secular purpose of the dependency statutes.

■ The final test regarding the establishment clause is whether the primary effect of the statute is to either advance or inhibit religion. The trial court's findings here, as already noted, show that while LSS was originally organized by the Lutheran Church, in practice the tenets of the Lutheran religion play little, if any, part in the provision of services to dependent children in foster care. It would be unreasonable to argue that the government may not contract with a religiously affiliated agency for provision of services such as these.

In *Bowen v. Kendrick*, 487 U.S. 589, 101 L. Ed. 2d 520, 108 S. Ct. 2562 (1988), the United States Supreme Court rejected the notion that religious institutions are disabled as a matter of course from participating as recipients of funds for publicly sponsored social welfare programs. *Kendrick*, at 608-09. By analogy, religious social service agencies should not be automatically prohibited from providing court-ordered social services.

Given that the record here shows no advancement of religion by LSS, we find that this test is also not met, and consequently, there is no establishment clause violation here.

The judgment of the trial court is affirmed.

The remainder of this opinion has no precedential value and, therefore, will not be published.

FORREST and KENNEDY, JJ., concur.

Reconsideration denied February 21, 1992.

Review denied at 119 Wn.2d 1009 (1992).